HENDERSON *v*. GLADISH.

4-5487 128 S. W. 2d 257

Opinion delivered May 8, 1939.

*W. Leon Smith* and *C. M. Buck,* for appellant.

*Taylor & Taylor, G. B. Segraves, A. F. Barham, A. W. Young* and *Holland & Barham,* for appellee.

GRIFFIN SMITH, C. J. In the democratic primary election August 9, 1938, Doyle Henderson opposed S. L. Gladish for re-election to the office of county and probate judge of Mississippi county.

The certified returns showed 3,550 votes to have been cast for Henderson and 3,560 for Gladish, the nomination of Gladish by a ten-vote majority having been declared.

Henderson duly contested.

The trial court found that 2,236 illegal votes had been cast: 1,091 for Gladish, and 1,145 for Henderson. In consequence of subtractions to conform to the court's findings, Henderson's net legal vote was adjudged to be 2,405, and that of Gladish 2,469, a majority of 64 for the latter.

Henderson appealed, but his bill of exceptions was not filed within the time allowed. On motion of Gladish it was stricken. We therefore determine whether errors appear on the face of the record.

One of the judgment recitals is: "The court finds that the report of the checkers, under the agreement of the parties and the instructions and findings of the court, is correct, and that [in the Wilson box there were cast] by voters otherwise qualified except that their [poll tax] receipts were filled in and signed with indelible pencil, 151 for Henderson and one for Gladish."

We first determine whether the court erred in its judgment that those who were otherwise qualified electors were deprived of that status by reason of the fact that the county collector, when he accepted payment of their poll tax within the time prescribed by law, issued receipts written with an indelible pencil, whereas act 123 of 1935 directs that such receipts shall be filled in and signed with pen and ink.

Appellee relies upon *Martin* v. *Gray*, 193 Ark. 32, 97 S. W. 2d 439, as authority for the trial court's ruling that 152 electors ceased to be such when they failed to acquire pen-and-ink-written receipts prior to midnight June 15, 1938.

In the Martin-Gray Case receipts had been delivered June 20, 1936, without bearing the indorsement, "This poll tax issued after June 15th." Parties holding such receipts were permitted to vote. Although testimony is not quoted at length, the bill of exceptions shows that Clarence Anderson, collector for Stone county, admitted the receipts were "mostly" delivered to John B. Gower, Luther Decker, and Brady Farris. Act 123 provides that ". . . the date written on the poll tax receipt shall be

the date of issuance." Purported written orders authorizing issuance of the receipts were handed to the collector about 11:30 the night of June 15 by Gower, Decker and Farris. Twenty-three of the so-called orders were, *prima facie,* given to Gower, twenty-six to Decker, and fifteen to Farris—a total of sixty-four. For reasons not important here, the opinion deals with only forty-six of the receipts.

The "orders" accepted by the collector were: "Mr. John B. Gower [or Decker, or Farris, as the case may have been] is authorized to pay my poll tax, and you may deliver the receipt to him."

Examples of the testimony are shown in the margin. [1]

---

[1] Appellant's attorney addressing Mr. Gower: "I have a bunch of orders here that you are supposed to have had, or that are supposed to have been issued to authorize you to buy poll tax receipts: were these orders given to you? A. I got some of the orders, but I don't remember whose they were. Q. Read off the first one there— who was the first one? A. The first one was signed by Ralph Rollins. Q. Did he give you that order in person? A. I don't remember whether he did or not. I had some orders for poll tax receipts. [Rollins] lived down in Belemore Township. Q. Did you go there and get the order? A. No, sir. Q. Was he in your office? A. Now, lots of those orders have been handled just like the law says.

"Q. Look at the next one. A. The next one is Togo Gray. Q. Did he issue that order to you? A. I don't know whether he did or not. Q. Where did you get the order? A. I got the orders here at the courthouse. Q. Who gave you the orders? A. He might have— some of these boys did, but I don't remember where. Q. Do you mean to tell the court that you presented an order or paid the poll tax without any written authority from the person? (No answer.)

"Q. What is the next one on the list? A. J. O. Kirkland. Q. Where were you when he gave you his order? A. I don't know; I have seen him several times. Q. Did he write that order and sign it and give it to you? A. I don't know whether he signed it or not; it was presented to me, but I don't know whether he presented it after it was written or not. Q. Do you remember who presented that order to you? A. I don't remember. Q. Did he do it, or not? A. I don't remember whether he did or not. Q. Well, if you don't remember, why did you present it to the collector for a poll tax receipt? A. I don't remember who presented these orders.

"Q. Read the next one: who is she? A. I suppose she is Charlie Kemp's wife. Q. Did she sign that order? A. I don't know whether she signed that or not. Q. Did you see her at any time before the 15th of June? A. No. Q. What are you doing with that order here with her name signed to it? A. These orders were given to me by different parties."

Other evidence was of like quality. Farris could not be located, and the court was deprived of the benefit of his version of how the transactions were handled. The trial court (Judge S. M. Bone presiding) found that the payments were illegal. On appeal this court held mandatory· that part of act 123 which prohibits the collector from issuing poll tax receipts after midnight of June 15, unless such receipts are stamped as the act directs. By reference to the opinion it will be found that the collector admitted having back-dated the receipts to June 15. This was a violation of the law. But the opinion goes further, and says:

"The Eighth Amendment [to the Constitution] recognizes the competency of the Legislature to ascertain and determine the time when poll taxes should be paid. Said amendment in part provides: '. . . and who shall exhibit a poll tax receipt or other evidence that they have paid their poll taxes *at the time of collecting taxes next preceding* such election.' The language quoted, 'at the time of collecting taxes,' relates to the time determined by the legislative enactment when such taxes must be paid. If the Legislature may determine the time when poll taxes must be paid, it may likewise determine, as it has done in act 123 of 1935, what must be done to accomplish such payment. By the act referred to 'payment of a poll tax' is not consummated as a condition of voting thereon until the issuance and delivery of the poll tax receipt prior to midnight of June 15 preceding the election at which it is to be used. We see no conflict between act 123 of 1935 and the Eighth Amendment."

While payment of a poll tax is the primary consideration from which arises the right to vote, the constitutional amendment of 1920 goes a step farther and says that such tax shall be paid "at the time of collecting taxes next preceding such election."

At most, the Martin-Gray Case only holds that the receipt evidencing payment of the tax must have been issued prior to midnight of June 15. It is not authority for the proposition that when the tax has admittedly been paid in a timely manner, and a receipt therefor has been

issued by the collector at the time of payment, such payment must be perpetuated in official obscurity because of a mere irregularity in the manner of writing the receipt —an irregularity which in no sense goes to the fact of timely issuance, but only to the manner of evidencing what admittedly was done. To extend the Martin-Gray Case, and make it apply to conditions such as we are dealing with in the appeal before us, would have the effect of penalizing by disfranchisement qualified electors. They were not delinquent. They did not unreasonably procrastinate. They did not, by delay, render it impossible or even impracticable for the collector to receipt them for their payments. They were not conscious of even a technical irregularity.

Act 123, approved March 19, 1935, is entitled: "An Act to Prevent Illegal or Improper Voting in Any General or Special Legalized Election in the State of Arkansas and to Supplement the Procedure in Primary Election Contests and to Provide for the Proper Assessment and Payment of Poll Taxes in the State of Arkansas, and for Other Purposes."

Section 1 makes it unlawful ". . . for any person to cast a vote in any general or special election hereafter held in the state of Arkansas, whether the same be a legal election now or hereafter provided for by law or whether the same be a general or special primary election held under the auspices of any political party in the state of Arkansas, unless the said person so casting a vote shall be a qualified elector as defined by the Constitution of Arkansas, Amendment No. 6 thereof, and § 3736 of Crawford & Moses' Digest of the Statutes of Arkansas." [2]

Section 2 makes it unlawful for any person to cast a ballot ". . . unless the said person shall have previously assessed and paid a poll tax. . . ."

The second paragraph of § 4 is: "All poll tax receipts issued by the collector shall be made out and signed with

[2] Section 3736 of Crawford & Moses' Digest is Amendment No. 6, referred to in § 1 of act 123 of 1935. Although the amendment is carried as No. 6 in Crawford & Moses' Digest, and in Applegate's "The Constitution of Arkansas," in the rearrangement of numbers it is the Eighth Amendment. See page 181 of Pope's Digest.

pen and ink. . . . The violation of any of the provisions or requirements of this section shall be deemed a misdemeanor and shall be punished by a fine of not less than $50 nor more than $200, and the violation of any of the provisions of this section shall render the person so violating the same ineligible to hold any office in this state." [8]

Section 6 provides that when an election contest has been filed by any candidate in a legalized primary election under §§ 3772 and 3773 of Crawford & Moses' Digest, ". . . the only inquiry which can be made into the qualifications of the supporting affiants mentioned in § 3772 of said digest must be confined to the question as to whether or not the persons are qualified electors and members of the party holding said primary election. . . ." The last sentence of § 6 is: *"Qualified elector is hereby construed to mean any person who is entitled to vote in said election, or has assessed and paid a poll tax as required by law."*

Section 8 prescribes a penalty ". . . in the event any person or persons shall cast a ballot in any legalized primary election held in this state when such person is not a qualified elector. . . ."

What are the requisites of an elector?

Prior to adoption of Amendment No. 8 to the Constitution of Arkansas,[4] § 1 of Art. 3 of the Constitution of

[8] Other provisions of § 4 are: The collector shall issue poll tax receipts in regular order as they appear in the books and upon forms as they are issued by the Auditor of State. The collector shall "cease issuing poll taxes after midnight of the 15th day of June of each year," and shall deliver to the county clerk the certified poll list within 15 days after June 15. "It is hereby made unlawful for any collecting officer to date such poll tax receipt, other than the correct date the same has in fact been issued; provided nothing in this section shall prohibit collecting officers from issuing poll tax receipts after June 15th of any year, and in such case the said collecting officer shall stamp across the face of such poll tax the following: 'This poll tax issued after June 15th.' When any poll tax is so issued and stamped as aforesaid, the same will not entitle the holder of the same to vote in any general or special election held thereafter in the year the said poll tax has been issued."

[4] Amendment No. 8 was adopted in 1920.

1874 conditionally made every male citizen of the United States, etc., an elector. Section 2 of that Constitution guarantees that "Elections shall be free and equal. No power, civil or military, shall ever interfere to prevent the free exercise of the right of suffrage; nor shall any law be enacted . . . whereby rights shall be impaired or forfeited, except for the commission of a felony at common law, upon lawful conviction thereof." [5]

By § 10 of Art. 3 of the Constitution of 1874, election officers are recognized—and therefore they are constitutional officers.

Section 11 of Art. 3 is: "If any officer of any election shall unlawfully refuse or fail to receive, count or return the vote or ballot of any qualified elector, such vote or ballot shall nevertheless be counted upon the trial of any contest arising out of said election."

Amendment No. 8 to the Constitution amended § 1 of Art. 3 of the Constitution of 1874, as amended by Amendment No. 9, adopted January 14, 1900.[6] By refer-

[5] So jealous of the right of franchise were the framers of our Constitution that they prohibited the Legislature (§ 2, of Art. 3) from impairing the right to vote by declaring any crime to be a felony that was not such under the common law. (But compare Amendment No. 8.)

[6] Amendment No. 8 is as follows: "That § 1, of Art. 3, of the Constitution of the state of Arkansas, as amended by Amendment No. 9, adopted January 14, 1909, be amended so as to read as follows: '§ 1. Every citizen of the United States of the age of 21 years, who has resided in the state 12 months, in the county six months, and in the precinct, town or ward one month, next preceding any election at which they may propose to vote, except such persons as may for the commission of some felony be deprived of the right to vote by law passed by the General Assembly, and who shall exhibit a poll tax receipt or other evidence, that they have paid their poll tax at the time of collecting taxes next preceding such election, shall be allowed to vote at any election in the state of Arkansas, provided, that persons who make satisfactory proof that they have attained the age of 21 years since the time of assessing taxes next preceding said election and possess the other necessary qualifications, shall be permitted to vote, and provided, further, that the said tax receipt shall be so marked by dated stamp or written indorsement by the judges of election to whom it may be first presented as to prevent the holder thereof from voting more than once at any election. It is declared to be the purpose of this amendment to deny the right of suffrage to aliens; and

ence to Amendment No. 8 it will be seen that, aside from the exceptions mentioned therein, the right of franchise is given to citizens . . . "who shall exhibit a poll tax receipt . . . *or other evidence that they have paid their poll tax.*"

Such person . . . "shall be allowed to vote at any election . . ."

The quoted excerpts from Constitution and statute, it would seem, conclusively show that one who in other respects possesses the requisites of an elector *perfects his or her right to vote upon payment of a poll tax within the time prescribed by law.*

Possession of the receipt authorized by act 123 does not in itself invest the holder with the right to vote. The right arises when the tax is paid in a timely manner. The receipt is merely evidence of payment.

The General Assembly had the right to provide that poll tax receipts be written with pen and ink. It is a salutary, fraud-preventing safeguard in respect of which no reasonable citizen can complain. But the lawmaking body did not have power to prohibit election officers from receiving "other evidence" that the tax had been paid, nor did act 123 attempt to do so. On the contrary, the qualification of an elector is directly referable to Constitutional Amendment No. 8. Section 2 of act 123 makes the qualification "assessment and payment" of a poll tax. The constitutional amendment expressly provides for *other evidence,* and its exclusion by election officers is necessarily illegal. The officers possess a discretion in receiving or rejecting evidence other than pen-and-ink-written receipts, and if they should reject insubstantial evidence, that discretion would not be abused. To hold that one who has complied with the law by regular payment of the tax, but who becomes the victim of a careless, a designing, or an uninformed collector or deputy, would have the effect of completely disregarding the primary qualification of an elector, which, as has been shown, is the *actual timely payment of the tax.*

---

it is declared to be the purpose of this amendment to confer suffrage equally upon both men and women, without regard to sex; provided, that women shall not be compelled to serve on juries.' "

It may be urged that the citizen is negligent in accepting an irregular receipt. It is conceded that every person is presumed to know the law and that ignorance of its mandates is no excuse. Granting that *before* an election the holder of an irregular receipt may, by appropriate action, compel reissue, and that upon ascertaining the vice the elector should move for correction, nevertheless, the alternative remedy of the voter is available, and "other evidence" is not to be excluded, nor is the citizen's status as an elector destroyed through failure to adopt a remedy that at most goes to the evidence of what already exists.

A case decisive of the principle with which we are dealing is to be found in the twenty-fourth Arkansas Reports.[7] Farr's ballot was refused when he declined to subscribe to a statutory oath that he would support the Constitution of the United States and the Constitution of Arkansas, and that he had not voluntarily borne arms against the United States, or Arkansas, or aided, directly or indirectly, the so-called Confederate authorities since the eighteenth day of April, 1864.

The Constitution of 1864,[8] in effect when the election controversy arose, provided that ". . . every free white male citizen of the United States who shall have attained the age of 21 years, and who shall have been a citizen of the state six months next preceding the election, shall be deemed a qualified elector, and be entitled to vote in the county or district where he actually resides."

The oath prescribed by the General Assembly was a requirement additional to the constitutional qualifications, The opinion, written by Chief Justice YONLEY, is in part as follows:

"[The legislative requirement] is, in effect, nothing but a prohibition upon the right to vote as secured by the Constitution. . . . To admit that the Legislature may do this would be to declare that part of the Constitution which defines the qualifications of a voter, absolutely nugatory, and would turn § 2 of Art. 4 of our Constitution

---

[7] *Rison et al.* v. *Farr*, 24 Ark. 161, 87 Am. Dec. 52.

[8] Constitution of 1864, § 2, Art. 4.

into the merest nonsense. . . . The Legislature cannot, under color of regulating the manner of holding elections, which to some extent that body has a right to do, impose such restrictions as will have the effect of taking away the right to vote as secured by the Constitution.''

An opinion written by Chief Justice COCKRILL (*Wheat* v. *Smith*)[9] has been frequently cited by this court. Wheat was elected circuit clerk of Lafayette county in 1884 for a two-year term, and held over without claiming under a subsequent election. Smith claimed that at a special election in 1887 he had been elected to fill the vacancy. The proceeding was one to oust Wheat as a usurper and to place Smith in possession of the office. Regularity of the election under which Smith claimed was made in issue, the contention being that notice of the special election had not been published in a newspaper, as required by law. The opinion, in part, is: ''The courts hold that 'the voice of the people is not to be rejected for a defect or want of notice, if they have in truth been called upon and have spoken.' If the law were otherwise it would '. . . always be in the power of the ministerial officer by his malfeasance to prevent a legal election.' ''

This court, in *Parrish* v. *Nelson*,[10] declared the law to be that ''. . . failure to comply with the law by election officers, whether the result of carelessness, ignorance, or negligence, destroys the integrity of the return, but it does not have the effect of disfranchising the voters of the district, and does not make the election void.''

We said, in *Vanhoose* v. *Yingling*,[11] at page 1010: ''Payment of a poll tax is essential to constitute one an elector.'' That case was decided in 1927, and the quoted expression had reference to the constitutional requirement of payment. Act 123 was not in effect at that time, but the abstract principle declared was that *payment, not*

[9] 50 Ark. 266, 7 S. W. 161.

[10] 186 Ark. 1118, 57 S. W. 2d 1037. See, also, *Fleming* v. *Rolfe*, 189 Ark. 865, 75 S. W. 2d 397; *Whittaker* v. *Mitchell*, 179 Ark. 993, 18 S. W. 2d 1026.

[11] 172 Ark. 1009, 291 S. W. 420.

*the evidence of payment,* entitles the citizen to vote. By "payment" is meant *timely* payment.

Ruling Case Law[12] is to the effect that ". . . where noncompliance with law arises, not out of an entire omission by an officer to perform his duty, but from an imperfect performance, the voters cannot be legally barred from voting; since the misfeasance or malfeasance of public officers can have no effect to impair a personal, vested constitutional right."

There is the further rule[13] that ". . . presumably all the provisions [of the statutes] have a purpose, and therefore should be observed. Before an election they must all be regarded as mandatory and their observance may be insisted upon and enforced. After an election, however, they must be regarded in a somewhat different light. It is true that questions affecting the purity of elections are of vital importance. Yet the problem is to secure a free, untrammeled vote, and a correct record and return thereof, and it is mainly with reference to these two results that the rules for conducting elections are prescribed by the legislative power. Hence, to hold these rules all mandatory, and essential to a valid election, would be to subordinate the substance to the form, the end to the means."

Innumerable cases from other jurisdictions might be cited in support of the rule that the mistake of an officer charged with responsibilities incident to an election, such as the issuance of poll tax receipts, will not avoid the election or have the effect of disfranchising the voter whose evidence of the right to participate in the election was irregular. *Jones* v. *State,* decided by the Supreme Court of Indiana,[14] is in point. There it was said:

"To hold that all prescribed duties of election officers are mandatory, in the sense that their nonperformance shall vitiate the election, is to ingraft upon the law the very powers for mischief it was intended to prevent. If the mistake or inadvertence of the officer shall be fatal to

---

[12] Vol. 9, p. 1039.

[13] Ruling Case Law, Vol. 9, p. 1091.

[14] *Jones* v. *State, ex rel. Wilson,* 153 Ind. 440, 55 N. E. 229.

the election, then his intentional wrong may so impress the ballot as to accomplish the defeat of a particular candidate or the disfranchisement of a party. And it is no answer to say that the offending officer may be punished by the criminal laws, for this punishment will not repair the injury done to those affected by his acts. It is the duty of the courts to uphold the law by sustaining elections thereunder that have resulted in a full and fair expression of the public will, and, from the current of authority, the following may be stated as the approved rule: All provisions of the election law are mandatory, if enforcement is sought before election in a direct proceeding for that purpose; but after election all should be held directory only, in support of the result, unless of a character to effect an obstruction of the free and intelligent casting of the vote or to the ascertainment of the result, or unless the provision affects an essential element of the election, or unless it is expressly declared by the statute that the particular act is essential to the validity of the election, or that its omission shall render it void.''

Our conclusion with respect to the 152 ballots challenged on the sole ground that the voters were not qualified electors is that 151 of such ballots must be counted for Henderson, and one for Gladish.

Appellee has taken a cross-appeal, and insists that even though 151 of the 152 challenged ballots should be counted for Henderson, appellee still has a majority, and that judgment recitals reflect this fact. The court found that ''all persons voting in said election upon a poll tax receipt based upon a delinquent assessment were unqualified voters.'' Commenting upon this declaration of the judgment, appellee says:

''This, of course, is erroneous, unless you go to the bill of exceptions to ascertain why this finding was made. Under this finding twelve votes were taken from the appellant and 123 from the appellee. Another finding is that all persons voting upon a poll tax receipt paid for and delivered after midnight of June 15, 1938, were unqualified to vote in said election. This, of course, is erroneous, for the law allows the sheriff to have poll tax re-

ceipts in his possession for five days after June 15. Under this finding six votes were taken from appellant and sixty-six from appellee. Under the finding in regard to votes out of the township, thirty-eight were taken from the appellant, and fifteen from the appellee."

There is a presumption that the court's findings of facts were supported by substantial evidence. This presumption attaches to the exceptions urged by appellee. Without referring to the bill of exceptions (stricken at appellee's request) this court cannot determine whether those who voted "upon a poll tax receipt based upon a delinquent assessment" were, or were not, qualified electors. If the delinquent assessments were made by the collector, they were invalid. Other grounds of invalidity are possible.

This court held, in *Martin* v. *Gray, supra,* that poll tax receipts issued after midnight of June 15 are invalid. That case is relied upon by appellee as authority for the exclusion of votes cast by those whose receipts were written with indelible pencil.

Questions are raised by appellee in respect of other votes, but in the absence of a bill of exceptions from which the facts might be ascertained, the judgment must be accepted as correct.

It is finally urged that findings of facts contained in the judgment are surplusage;[15] that approval of the judgment by appellee was as to form only, and that recitations relating to the merits of the controversy should be stricken, leaving the following: "It is therefore by the court ordered, considered, and decreed that the contestee was the lawful nominee of the democratic party for the office of county and probate judge of Mississippi county, Arkansas, in the primary election held in said county on the 9th day of August, 1938, and that the complaint of contestant be, and the same is, hereby dismissed."

---

[15] *Bradley* v. *Harkey,* 59 Ark. 178, 26 S. W. 827; *Dunnington* v. *Frick Co.,* 60 Ark. 250, 30 S. W. 212; *White* v. *Beal & Fletcher Grocer Co.,* 65 Ark. 278, 45 S. W. 1060; *Bluff City Lumber Company* v. *Floyd,* 70 Ark. 418, 68 S. W. 484.

Section 1534 of Pope's Digest directs that "Upon trials of questions of fact by the court, it shall state in writing the conclusions of fact found separately from the conclusions of law."

Findings of fact may be brought into the record by appropriate proceedings. Such findings, when made separately from the judgment, are not a part of the judgment. In the instant case, however, the facts recited in the judgment were necessary to its clarity. While it is approved by appellee as to form only, the form so approved included the findings of facts, such facts having been a part of the judgment when approved.

In any view to be taken of the case (after finding, as we must, that the voters who received receipts written with indelible pencil are not to be excluded) appellant has a clear majority of the legal votes.

The judgment is reversed, and the cause remanded with directions that appellant be declared the nominee.

SMITH, McHANEY and BAKER, JJ., dissent.