GACKLER LAND COMPANY, INC v YANKEE SPRINGS
TOWNSHIP

Docket No. 75246. Argued November 12, 1985 (Calendar No. 3).
Decided December 30, 1986.

Gackler Land Company, Inc., brought an action in the Barry
Circuit Court against Yankee Springs Township, challenging a
zoning restriction banning mobile or prefabricated homes ex-
cept in mobile home parks. At the time the plaintiff's land was
platted, the township zoning ordinance permitted placement or
construction of such homes on the land. Thereafter, the ordi-
nance was amended to include the restriction, after the plain-
tiff had effected improvements and had placed mobile or prefab-
ricated homes on eleven of forty-two lots. The court, Richard
Robinson, J., upheld the ordinance and ruled that the plaintiff
was not entitled to use the remaining lots in a manner not in
conformance with the ordinance.

Following the decision, the Supreme Court decided *Robinson
Twp v Knoll,* 410 Mich 293 (1981), holding that the exclusion
per se of mobile homes from all areas not designated as mobile
home parks was not a permissible exercise of the police power,
and the trial court granted the plaintiff a new trial. In the
interim, the township had amended the zoning ordinance to
permit mobile or prefabricated homes outside mobile home
parks, provided, inter alia, the homes had a minimum width of
twenty-four feet. The circuit court held the new standards valid
and found against the plaintiff on the ground that it had failed
to establish that the restrictions precluded the use of the
plaintiff's property for any purpose for which it was reasonably

REFERENCES

Am Jur 2d, Mobile Homes, Trailer Parks, and Tourists Camps
§§ 13, 14.
Am Jur 2d, Zoning and Planning §§ 14, 16, 38 *et seq.,* 178, 179, 183
*et seq.*
Validity and application of zoning regulations relating to mobile
home or trailer parks. 42 ALR3d 598.
Aesthetic objectives or considerations as affecting validity of zoning
ordinance. 21 ALR3d 1222.
Use of trailer or similar structure for residence purposes as within
limitation of zoning provision. 96 ALR2d 232.

adapted. The Court of Appeals, R. M. MAHER, P.J., and R. B. BURNS and ROSKOPP, JJ., affirmed in an opinion per curiam (Docket No. 67022). The plaintiff appeals.

In an opinion by Justice BOYLE, joined by Justices BRICKLEY, CAVANAGH, and RILEY, the Supreme Court *held:*

The zoning ordinance at issue is neither unconstitutional on its face nor as applied to the plaintiff's property.

1. The requirements of the zoning ordinance are either reasonable standards designed to assure favorable comparison of mobile homes with housing built on site or constitute a reasonable exercise of police power for the protection of the public. Moreover, the ordinance does not preclude other reasonable uses of the land. Confiscation is not established simply by showing a disparity in value with respect to various uses.

2. A tangible change in the property by way of preparation for the actual use of the property as a plat for single-width mobile homes was not established by virtue of expenditures in the development of the land as a residential subdivision. The property, as developed, is suitable for site-built, double-width, and single-width mobile homes. Although approximately one-fourth of the back lots in the plat are occupied by single-width mobile homes, an apparent use of the property as a plat for single-width mobile homes has not been established when the remaining back lots could be used for site-built or mobile homes at the plaintiff's option.

3. The ordinance is not preempted by federal or state law. The ordinance regulates the location and conditions of mobile home placement and, thus, does not conflict with state and federal construction and industry regulations.

Affirmed.

Justice LEVIN, joined by Chief Justice WILLIAMS, dissenting, stated that a use of property consistent with a zoning ordinance at the time development is begun may be continued following amendment of the ordinance that would bar its use, without regard to whether the property, consistent with the change in zoning, can be used for another purpose, where the owner had established a vested right to so use the land prior to the amendment by tangibly changing the land by excavation and construction or by making substantial expenditures with respect to development of the land.

1. An owner of property who seeks to establish a vested right to a use of the land not in conformance with an amended zoning ordinance need not show that the land cannot feasibly be used in conformity with the changed zoning. The inquiry is whether the nonconforming use was established before the

enactment of the zoning that would bar the use. If so, the use may be continued without regard to whether the property, consistent with the change in zoning, can be used for another purpose.

2. Generally, land development and building construction extend over a period of time. A developer will be recognized to have established a vested right to a use not in conformance with an amended zoning ordinance where there has been a tangible change in the land by excavation and construction or where work of a substantial character has been done. A landowner that has reached a stage of substantial construction or action on the basis of an existing zoning ordinance has the right to complete the development and to use the property in accordance with the zoning extant when the work was begun without regard to zoning amendments which thereafter become effective.

3. In this case, the plaintiff had established a vested right to sell the lots in issue for single-width prefabricated homes before the ordinance was amended. The development was lawfully begun prior to the change in zoning, and substantial sums of money were spent in carrying out the construction plan. The pattern of development was well-established at the time the ordinance was amended.

4. It is not sufficient to say to a land developer who has made expenditures for sewer, water, and road improvements in reliance on existing zoning that the improvements have made the land as suitable or equally suitable for a use consistent with a change in zoning as a use permitted under the former zoning. Decisions to invest are made in part on the basis of existing zoning. Such investment-backed expectations are entitled to protection. A land or lot developer should be permitted to use its property for a use permitted when improvements are made unless a court can properly find that the investment was made without regard to the zoning.

Justice ARCHER took no part in the decision of this case.

138 Mich App 1; 359 NW2d 226 (1984) affirmed.

1. ZONING — LAND USE — MOBILE HOMES.

A municipality may exclude or restrict placement of mobile homes in residential neighborhoods where the homes fail to satisfy reasonable standards designed to assure favorable comparison of mobile homes with homes constructed on a site.

2. ZONING — LAND USE — CHALLENGES OF ORDINANCES.

In order to successfully challenge a zoning ordinance, the ordi-

nance must be shown to be an arbitrary and unreasonable restriction upon the use of the property in question with no room for legitimate differences of opinion concerning reasonableness and, if enforced, to preclude use of the property for any purposes for which it is reasonably adapted.

3. ZONING — NONCONFORMING LAND USE — CHALLENGES OF ORDINANCES.

A zoning ordinance prohibiting the enlargement of a nonconforming land use is not subject to challenge as an unreasonable deprivation of property rights; such restriction is within the police power of the state and has for its purpose the elimination of inconsistency brought about by the nonconforming use.

4. ZONING — NONCONFORMING LAND USE — TANGIBLE CHANGE IN LAND.

To establish a nonconforming use of land, a property owner must show work of a substantial character done by way of preparation for an actual use of the property; the use must be apparent and manifested by a tangible change in the land, rather than an intended or contemplated change.

5. ZONING — LAND USE — MOBILE HOMES — CONSTRUCTION AND SAFETY STANDARDS.

A zoning ordinance which limited placement of mobile homes within a municipality regulated land use and did not conflict with state or federal standards for the construction or safety of mobile homes (42 USC 5401 *et seq.;* MCL 125.1101 *et seq.,* 125.1519, 125.1520; MSA 19.855[1] *et seq.,* 5.2949[19], 5.2949[20]).

*Siegel, Hudson, Gee, Shaw & Fisher* (by *James H. Fisher)* for the plaintiff.

*Bauckham, Reed, Lang, Schaefer, Sparks & Rolfe, P.C.* (by *Richard L. Lang)* for defendant Yankee Springs Township.

*Law, Weathers & Richardson* (by *Robert W. Richardson)* for defendant Payne Lake Association.

Amici Curiae:

*Dykema, Gossett, Spencer, Goodnow & Trigg* (by *Rex E. Schlaybaugh, Jr., William J. Perrone,* and

*Daniel M. Moore*) for Michigan Manufactured Housing Institute.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Walter V. Kron* and *James L. Stropkai,* Assistant Attorneys General, for Michigan Mobile Home Commission.

BOYLE, J. This case involves the validity of a zoning ordinance in Yankee Springs Township, Barry County, Michigan, which excludes from the property of plaintiff, Gackler Land Company, Inc., the placement of "single-wide" mobile homes that do not comply with certain requirements.

Plaintiff presents the following questions for our consideration: (1) Whether the zoning ordinance is unconstitutional on its face or as applied to plaintiff's plat, (2) whether plaintiff has established a vested nonconforming use as a single-wide mobile home plat, and (3) whether certain portions of the zoning act are preempted by federal and state law.

We hold that the zoning ordinance is neither unconstitutional on its face nor as applied to plaintiff. The requirements of the zoning ordinance are either reasonable standards designed to assure favorable comparison of mobile homes with site-built housing or constitute a reasonable exercise of police power for the protection of the public. Moreover, the zoning ordinance does not preclude other reasonable uses of the land. Plaintiff cannot establish a confiscation by simply showing a disparity in value between uses.

We further hold that by virtue of expenditures in the development of the land as a residential subdivision, plaintiff has not established a tangible change by way of preparation for the actual use of the property as a single-wide mobile home plat. The property, as developed, is suitable for site-

built, double-wide, and single-wide mobile homes. Although approximately one-fourth of the back lots in the plat are occupied by single-wide mobile homes, an apparent use of the property as a single-wide mobile home plat has not been established when the remaining back lots could be used for site-built or mobile homes at the plaintiff's option.

Finally, we hold that the federal and state laws do not preempt portions of the zoning ordinance. The zoning ordinance regulates the location and conditions of mobile home placement and therefore does not conflict with the construction and industry regulations set forth by the federal and state laws.

Accordingly, the decisions of the trial court and the Court of Appeals upholding the zoning ordinance are affirmed.

FACTS

The plaintiff platted approximately twenty acres of a 103-acre tract along the northwest shore of Payne Lake. This plat, "Gackler's Payne Lake Plat," was approved by the township and consists of fifty-four lots. The zoning in effect at that time permitted mobile, prefabricated, and site-built homes on the lots. After the plat was approved, restrictions were recorded excluding mobile homes from the twelve lots which bordered the lake. Through 1972, eleven single-wide mobile homes had moved onto the back lots in the plat.

In 1972, the defendant township enacted a zoning ordinance which restricted mobile homes to mobile home parks. Pursuant to this Court's decision in *Robinson Twp v Knoll,* 410 Mich 293; 302 NW2d 146 (1981), the township amended its zoning ordinance to permit mobile homes meeting the

definition of "dwelling" in any zoning classification where site-built or modular single family residences were allowed. "Dwelling" was defined in the zoning ordinance as follows:

1. It complies with the minimum square footage requirements [720 square feet].

2. It has a minimum width along any exterior side elevation of 24 feet and a minimum internal height of seven and one-half feet.

3. It is firmly attached to a solid foundation constructed on the site in accordance with the township building code, which shall be a fully enclosed basement or crawl space . . . .

4. It does not have exposed wheels, towing mechanisms, undercarriage or chassis.

5. The dwelling is connected to a public sewer and water supply or to such private facilities approved by the local health department.

6. The dwelling contains storage area(s) either in a basement located under said dwelling, in an attic area, in a closet area or in a separate fully enclosed structure on the site, . . . equal to not less than 15% of the interior living area of the dwelling.

7. The dwelling is aesthetically compatible in design and appearance to conventionally on-site constructed homes . . . .

8. The dwelling contains no additions of rooms or other areas which are not constructed with similar materials and are similar in appearance and with similar quality of workmanship as in the original structure . . . .

9. The dwelling complies with all pertinent building and fire codes . . . .[1] [138 Mich App 1, 7-8; 359 NW2d 226 (1984).]

---

[1] Additional requirements were established for mobile homes placed in the best residential zoning classifications in the township. These latter requirements, as well as a requirement that all mobile homes located outside of mobile home parks secure special use permits, were invalidated by the trial court. No appeal having been taken by the township on this ruling, these requirements are not at issue in the present case.

The effect of this ordinance was to exclude single-wide mobile homes from placement on plaintiff's lots unless the foregoing requirements were met. The plaintiff challenged this portion of the zoning ordinance as unconstitutional on its face and as applied to plaintiff, and because it was preempted in part by state and federal law. Plaintiff also averred that it had established a prior nonconforming use in the property as a single-wide mobile home plat. Following a bench trial, the trial court upheld the ordinance as to these requirements and rejected plaintiff's claim that it had established a nonconforming use. The Court of Appeals affirmed the decision. We agree.

## I. IS THE ZONING ORDINANCE CONSTITUTIONAL ON ITS FACE AND AS APPLIED TO PLAINTIFF?

Plaintiff contends that the township zoning ordinance is unconstitutional on its face because it operates to exclude all single-wide mobile homes from areas other than mobile-home parks. We disagree.

In *Robinson Twp v Knoll, supra,* 310, this Court held that "[t]he per se exclusion of mobile homes from all areas not designated as mobile-home parks has no reasonable basis under the police power, and is therefore unconstitutional." We also held:

> [A] municipality need not permit all mobile homes, regardless of size, appearance, quality of manufacture or manner of on-site installation, to be placed in all residential neighborhoods. A mobile home may be excluded if it fails to satisfy reasonable standards designed to assure favorable comparison of mobile homes with site-built housing which would be permitted on the site, and not merely because it is a mobile home. [*Id.*]

The requirements for a "dwelling" within the definition of the zoning ordinance are set forth in the facts stated above.

We initially note that these regulations do not treat mobile homes materially different than site-built homes. We further find that the requirements, as stated, are either reasonable standards designed to assure favorable comparison of mobile homes with site-built housing, or constitute a reasonable exercise of police power for the protection of the safety, health, morals, prosperity, comfort, convenience, and welfare of the public or a substantial part of the public. *Robinson Twp, supra,* 312.

Nor are we persuaded that the zoning ordinance is unconstitutional as applied to plaintiff. We believe the trial court properly summarized the plaintiff's argument in this regard:

> The thrust of plaintiff's argument is that because there are already existing on the land in question as nonconforming uses 11 mobile homes, any ordinance that prevents the placing of similar mobile homes on the remaining lots is unreasonable. The reasons for this conclusion are that (1) because mobile homes are situated on the plat in question that are nonconforming, aesthetics cannot be a proper concern of the township, at least in regard to the requirement that dwellings have an interior ceiling height of 7½ feet, and an external width of 24 feet, and (2) that because there is no indication that any of the existing mobile homes will be vacating, it is not reasonable for the township to continue to classify these homes as nonconforming uses, which must be replaced with conforming uses when their useful life is over, and to require conforming uses on the as yet unsold lots. . . .
>
> Plaintiff [further] argues that (1) the ordinance restricts a reasonable use of the land (that being

used as a site for placing mobile homes thereon) and (2) plaintiff cannot sell the remaining plots at the price he is asking for any use other than mobile home sites because no one will want to purchase land to build next to mobile homes.

The following principles of law are applicable to plaintiff's claim:

> The plaintiff must show:
> "[F]irst, that there is no reasonable governmental interest being advanced by the present zoning classification itself . . . or
> "[S]econdly, that an ordinance may be unreasonable because of the purely arbitrary, capricious and unfounded exclusion of other types of legitimate land use from the area in question." [*Kirk v Tyrone Twp*, 398 Mich 429, 434; 247 NW2d 848 (1976).]

There are four rules for applying these principles:

> 1. " '[T]he ordinance comes to us clothed with every presumption of validity.' "
> 2. " '[I]t is the burden of the party attacking to prove affirmatively that the ordinance is an arbitrary and unreasonable restriction upon the owner's use of his property . . . . It must appear that the clause attacked is an arbitrary fiat, a whimsical *ipse dixit,* and that there is no room for a legitimate difference of opinion concerning its reasonableness.' "
> 3. "Michigan has adopted the view that to sustain an attack on a zoning ordinance, an aggrieved property owner must show that if the ordinance is enforced the consequent restrictions on his property preclude its use for any purposes to which it is reasonably adapted."
> 4. " 'This Court, however, is inclined to give considerable weight to the findings of the trial

judge in equity cases.'" [*Kirk, supra,* 439-440. Citations omitted.]

We disagree with plaintiff that the existence of eleven single-wide homes in the plat renders the ordinance unreasonable to plaintiff. Notwithstanding the eleven mobile homes, the zoning ordinance will improve the aesthetics of the area, thereby advancing a reasonable government interest. Moreover, the state may properly provide for the limitation and eventual elimination of a nonconforming use in order to advance the goals of the zoning plan. *Austin v Older,* 283 Mich 667, 676; 278 NW 727 (1938).

We also conclude that plaintiff has not carried its burden of establishing that if the ordinance is enforced, any purpose to which the land is reasonably adapted is precluded. As the trial court found, "the ordinance did not deprive plaintiff of other uses of his land, since the evidence indicated that the vacant lots would sell for conventional or modular home occupancy if the asking price was realistic and if screening was provided for the existing mobile homes." We further agree with the Court of Appeals that plaintiff cannot establish a confiscation by simply showing a disparity in value between uses. *Brae Burn, Inc v Bloomfield Hills,* 350 Mich 425; 86 NW2d 166 (1957); *Kirk v Tyrone Twp,* 398 Mich 429; 247 NW2d 848 (1976). Justice SMITH pointed out in *Brae Burn, Inc v Bloomfield Hills, supra,* 433-434:

> Disparity in values between residential and commercial uses will always exist. . . . If such a showing serves to invalidate an ordinance the efforts of our people to determine their living conditions will be hopeless. To avoid "confiscation" in this sense (the obtaining of the highest dollar for one particular lot) will result in confiscation of far greater

scope in property values in the municipality as a whole due to its inability to control its growth and development.

We stress that this is not a situation where the property is unsuitable for the uses allowed by the zoning ordinance and has little or no value if so restricted. Compare *Fenner v Muskegon,* 331 Mich 732; 50 NW2d 210 (1951). Therefore, the issue of confiscation is not properly before us. See *Brae Burn, supra.*

In summary, we find that plaintiff has not established that the zoning is unconstitutional either on its face or as applied to plaintiff.

## II. HAS PLAINTIFF ESTABLISHED A NONCONFORMING USE IN THE PROPERTY AS A SINGLE-WIDE MOBILE HOME PLAT?

Plaintiff asserts that it has established a vested nonconforming use as a mobile home plat in advance of the existence of the zoning ordinance, by virtue of the following facts: (1) a road was constructed, (2) the plat was surveyed and monuments were erected, (3) grading and excavation work was completed, and (4) eleven mobile homes were installed. Plaintiff further argues that the plat must be viewed as a whole and that, when so viewed, the pattern of development of the plat as a mobile home plat was well-established prior to the enactment of the zoning ordinance. Even viewing the plat as a whole, we are not so persuaded.

A claim to a prior nonconforming use does not test the reasonableness of a zoning ordinance. "A prior nonconforming use is a vested right to continue the lawful use of real estate in the manner it was used prior to the adoption of a zoning ordinance." *Dusdal v City of Warren,* 387 Mich 354,

359; 196 NW2d 778 (1972). A zoning ordinance cannot operate to oust the property owner of his vested right even though the ordinance is reasonable. *Id.* "An ordinance requiring immediate cessation of a nonconforming use may be held to be unconstitutional because it brings about a deprivation of property rights out of proportion to the public benefit obtained . . . ." *Austin v Older, supra,* 676. However, an ordinance prohibiting the enlargement of a nonconforming use is not subject to the same challenge. *Id.* This more limiting restriction is within the police power of the state and has for its purpose the elimination of the inconsistency brought to bear by the nonconforming use in a zoning classification. *Id.*[2]

To establish a nonconforming use, "there must be work of a 'substantial character' done by way of preparation for an actual use of the premises." *Bloomfield Twp v Beardslee,* 349 Mich 296, 307; 84 NW2d 537 (1957). The actual use which is nonconforming must be apparent and manifested by a tangible change in the land, as opposed to intended or contemplated by the property owner. In this regard, preliminary operations such as order-

---

[2] "The ultimate purpose of zoning ordinances is to confine certain classes of buildings and uses to certain localities. The continued existence of those which are nonconforming is inconsistent with that object, and it is contemplated that conditions should be reduced to conformity as completely and speedily as possible with due regard to the special interest of those concerned, and where suppression is not feasible without working substantial injustice, that there shall be accomplished 'the greatest possible amelioration of the offending use which justice to that use permits.' 'The accepted method of accomplishing this result is as follows: The nonconformity is in no case allowed to increase. It is permitted to continue until some change in the premises is contemplated by the owner, when, in so far as expedient, the authorities take advantage of this fact to compel a lessening or complete suppression of the nonconformity.'" [*Austin v Older, supra,* 675, quoting Williams, Law of City Planning and Zoning (1st ed), pp 202-203.]

ing plans, surveying the land, and the removal of old buildings are insufficient to establish a nonconforming use. *Id.; Lansing v Dawley*, 247 Mich 394, 397; 225 NW 500 (1929). The test in each case is not whether a little or a lot has been spent in reliance upon the past zoning classifications, but, rather, " 'whether there has been any tangible change in the land itself by excavation and construction.' " *Id.*

In the case at bar, the dissent would hold:

> [T]he subdivision development should be viewed as a whole, as a structure only part of which had been completed, analogous to a building that is partially completed or to a nonconforming use that is established in a portion but not in all of a building before an amendment to a zoning ordinance rendering such structure or use nonconforming. It has been said that "the extension of the nonconforming use is permissible if the design of the building indicates that at the time of the passage of the zoning restriction it was intended that the building be dedicated in its entirety to such use." [*Post*, p 587, quoting 8A McQuillin, Municipal Corporations (3d rev ed), § 5.208, p 118.]

We find this analogy inapposite. This is not a situation where construction of a project before completion is halted by the enactment of a zoning ordinance and to disallow completion of the project would work a clear injustice. Compare *Eklund v Clackamas Co*, 36 Or App 73, 82; 583 P2d 567 (1978). In this case, development of the plat is virtually complete save for sewer and water hookups on the back lots which have no bearing on whether the land will be used for "dwellings" under the ordinance or as a single-wide mobile home plat. Moreover, it is undisputed that the improvements to the property have made the lots as suitable for "dwellings" under the ordinance as

they are for single-wide mobile homes. Further, on
twelve of the lots, mobile homes are prohibited by
covenant. Therefore, there is no concrete manifes-
tation that development of the plat was dedicated
in its *entirety* to the use as sites for single-wide
mobile homes.

The dissent writes, "A property owner who
claims a vested right to a nonconforming use need
not show that the land cannot feasibly be used in
conformity with the changed zoning." (*Post,* p 584.)
While this statement may be true in general,
whether the land is suitable for the uses permitted
in the zoning ordinance is relevant to the question
whether a nonconforming use exists at the time
the zoning ordinance is enacted.

In this case, the improvements to the land by
way of the road construction, surveying, setting of
monuments, grading, and excavation work have
rendered the lots in the plat equally suitable for
the placement of single-wide mobile homes and
conventional dwellings. These improvements,
therefore, do not constitute work of a substantial
character which makes apparent an actual use of
the plat as a single-wide mobile home plat. Nor
does the fact that approximately one-fourth of the
back lots are occupied by single-wide mobile homes
establish the nonconforming use. The trial court
found, and we agree, that the vacant lots would
sell for conventional or modular home occupancy
if the asking price were realistic and if screening
were provided for the existing mobile homes. The
presence of the existing mobile homes, therefore,
does not create an actual use in the vacant lots for
placement of single-wide mobile homes.

Because an insubstantial number of lots in the
plat are occupied by mobile homes, and the lots
are suitable for more than single-wide mobile
housing, this case is distinguishable from the

trailer park cases where use of the vacant spaces for trailers was readily apparent. See *Patchak v Lansing Twp,* 361 Mich 489; 105 NW2d 406 (1960); *Richards v City of Pontiac,* 305 Mich 666; 9 NW2d 885 (1943); *Co Bd of Comm'rs v Petsch,* 172 Neb 263, 268; 109 NW2d 388 (1961); *Blundell v West Helena,* 258 Ark 123, 131; 522 SW2d 661 (1975). We further note that in *Patchak* and *Blundell* only that portion of the tract clearly used for trailer park purposes was established as a nonconforming use. Extension of the nonconforming use to the entire tract was denied in each case because actual use of the entire tract as a trailer park had not been established at the time the zoning ordinance was enacted.[3]

Were it not for the zoning ordinance at issue, plaintiff would hold the option to sell the unsold unrestricted lots for the use which would command the highest price. Plaintiff claims that it can obtain a substantially higher price if the property is sold for mobile home use. Plaintiff therefore intends to sell the lots for that purpose. Accordingly, what plaintiff actually and understandably seeks here is preservation of an option to sell the

[3] In *Patchak,* the owner had not applied for nor secured the necessary license for operation of the vacant acres as a trailer park. Therefore, "[n]o nonconforming use was proven as to the south 10 acres." 361 Mich 499.

In *Blundell,* the court explained,

Preliminary contracts or work which is not of a substantial nature is not sufficient to establish a vested right. *The mere purchase of property with intention to devote it to a use is not sufficient in spite of preliminary work, such as clearing, grading and excavating, if that work is not of a substantial nature, or if the owner has not incurred substantial obligations relating directly to the use of the property.* Appellant has failed to meet his burden of proof to establish a permissible nonconforming use for trailer spaces in Lots 26 through 44. That use would constitute an extension prohibited by the zoning ordinance. [258 Ark 134. Citations omitted; emphasis added.]

unsold lots as sites for *future* nonconforming uses. However, plaintiff may be deprived of this option without offending the Due Process Clause as long as the zoning ordinance is not arbitrary or unreasonable. *Austin v Older, supra,* 677; *Patchak v Lansing Twp, supra,* 497-498. To hold that plaintiff must abide by the zoning ordinance in this case does not amount to a clearly confiscatory taking where the use of the *entire* plat as a single-wide mobile home plat rests solely within the owner's contemplation.[4]

Nor are we convinced by plaintiff's suggestion that the township is estopped from enacting the zoning restrictions because it had notice of plaintiff's plans to sell the property as sites for single-wide mobile homes by virtue of the plat restrictions recorded in the Barry County Register of Deeds. The trial court found that the township approved plaintiff's plat without being aware of the plat's restrictions. Moreover, plaintiff has not asserted any authority on appeal to this Court to

---

[4] We are not in disagreement with the cases cited by Justice LEVIN in his opinion. Unlike the case at bar, in those cases, the existence of a nonconforming use was established by facts indicating the clear extent of the project as a nonconforming use.

Justice LEVIN in this case would find the existence of a nonconforming use by focusing on the right of a developer to be protected in his investment (which we understand to be the original investment) made on the basis of existing zoning. In doing so, the rights of the developer are elevated over the interests of the community at large. This concept would permit developers to freeze existing zoning by the fact of their initial investment—a notion that approaches the highly suspect practice of "spot zoning." See, generally, McQuillin, Municipal Corporations, § 25.83, pp 242-250. (The legislative intent "in authorizing comprehensive zoning is reasonable uniformity within districts having in fact the same general characteristics and *not* the marking off, for peculiar uses or restrictions of small districts essentially similar to the general area in which they are situated. . . . *Thus, singling out of one lot or a small area for different treatment from that accorded to similar surrounding land indistinguishable from it in character, for the economic benefit of the owner of that lot or to his economic detriment, is invalid 'spot' zoning.*") *Id.,* 242 (emphasis added). See also *SBS Builders, Inc v Madison Heights,* 389 Mich 323; 206 NW2d 437 (1973).

support the proposition that the township is bound by these restrictions incurred privately by plaintiff with other parties. Therefore, this argument is without merit.

### III. IS THE ZONING ORDINANCE INVALID BECAUSE IT IS PREEMPTED BY FEDERAL AND STATE LAW AND WAS NOT ENACTED PURSUANT TO THE MICHIGAN MOBILE HOME COMMISSION ACT?

The plaintiff also contends that certain portions of the zoning ordinance are preempted by federal and state law, specifically, the National Manufactured Housing Construction and Safety Standards Act, 42 USC 5401 *et seq.*, the State Construction Code Act, MCL 125.1519, 125.1520; MSA 5.2949(19), 5.2949(20), and the Mobile Home Commission Act, MCL 125.1101 *et seq.;* MSA 19.855(1) *et seq.* Both the trial court and the Court of Appeals disagreed with plaintiff, finding that the various acts provide construction and safety standards, not standards concerning proper land use, which is the thrust of zoning laws. We believe the lower courts have properly interpreted these statutes.

The purpose of the federal act is set forth in 42 USC 5401:

> The Congress declares that the purposes of this chapter are to reduce the number of personal injuries and deaths and the amount of insurance costs and property damage resulting from manufactured home accidents and to improve the quality and durability of manufactured homes. Therefore, the *Congress determines that it is necessary to establish Federal construction and safety standards for manufactured homes and to authorize manufactured home safety research and development.* [Emphasis added.]

Further, § 5403(d) provides that no state or political subdivision thereof may establish a standard regarding *construction or safety* of any manufactured home covered under the act. The requirements of the zoning ordinance in the case at bar are not standards regulating the construction and safety of mobile homes. Rather, they have for their purpose the regulation of where mobile homes may be placed and under what conditions. These requirements are for the purpose of regulating land use and therefore do not conflict with standards promulgated under the federal National Manufactured Housing Construction and Safety Standards Act. Accord *Brookside Village v Comeau,* 633 SW2d 790 (Tex, 1982), cert den 459 US 1087 (1982).

The same reasoning applied to the Michigan State Construction Code compels a similar conclusion under that code. Further, MCL 125.1502(m); MSA 5.2949(2)(m) specifically excludes from the definition of "construction regulation" under the code "a zoning ordinance or rule issued pursuant to a zoning ordinance and related to zoning." Therefore, we find that the Legislature has manifested an intention to specifically exclude from the code's coverage ordinances like the ordinance at issue which have for their purpose the implementation of zoning goals.

Finally, we have carefully considered the briefs of plaintiff and amicus curiae, but are not persuaded that zoning ordinances which regulate the conditions and locations of mobile homes outside mobile home parks are included within the scope of the Mobile Home Commission Act. Our review of MCL 125.1105; MSA 19.855(5) reveals that the rules which are to be promulgated under that act relate to the construction of mobile home *parks* and the regulation of mobile home *industries.*

Moreover, by enacting § 45, subsection 2 of the act,[5] we perceive that the Legislature intended to save ordinances validly enacted under the Township Rural Zoning Act, MCL 125.271; MSA 5.2963(1), from the provisions of the act. Therefore, we are not persuaded that the zoning ordinance at issue is invalid because those provisions establishing conditions for the placement of mobile homes outside of mobile home parks were not first submitted to the Mobile Home Commission for its review.

We affirm the decision of the Court of Appeals.

BRICKLEY, CAVANAGH, and RILEY, JJ., concurred with BOYLE, J.

LEVIN, J. (*dissenting*). Gackler Land Company, Inc., platted a twenty-acre strip of a larger tract into fifty-four lots and additional outlots. Restrictions were recorded limiting the use of the twelve lots fronting on Payne Lake to site-built homes and permitting the use of the remaining forty-two lots for mobile or prefabricated homes. A paved road serving all the lots was constructed in accordance with county road commission standards through the center of the strip, the lots were surveyed, graded and filled, monuments were set, excavation work for drainage was completed, and sewers were installed for some of the lots.[1]

When the plat was recorded in 1969, the township zoning ordinance permitted the construction of mobile or prefabricated homes on the back lots.

---

[5] This section provides:

> This act shall not be construed to prohibit a municipality from enforcing its local ordinances or from taking any other appropriate action to protect the public health, safety, or welfare as authorized by law or its charter. [MCL 125.1145(2); MSA 19.855(45)(2).]

[1] The lots fronting on Payne Lake are all on the east side of the road.

In 1972, the township amended its zoning ordinance to restrict mobile homes as there defined to mobile home parks. Single-wide (fourteen foot) mobile or prefabricated homes had by then been placed on eleven back lots.

Gackler commenced this action, challenging the zoning restriction banning mobile or prefabricated homes except in mobile home parks. A few days before this Court's decision in *Robinson Twp v Knoll,* 410 Mich 293, 310; 302 NW2d 146 (1981), the circuit judge found that the zoning restriction was reasonable, and that Gackler was not entitled to use the remaining back lots for single-wide prefabricated homes as a nonconforming use. In *Robinson Twp,* this Court held that the exclusion per se of mobile homes from all areas not designated as mobile home parks was not a permissible exercise of the police power. After *Robinson Twp* was decided, the judge granted a new trial.

Also after *Robinson Twp,* the township amended its zoning ordinance to permit mobile or prefabricated homes in residential zoning districts provided, among other criteria, the minimum width of the home was twenty-four feet. Over eighty-five percent of all the mobile or prefabricated homes sold are single wide, fourteen feet being the greatest width permitted on the highway. All the prefabricated homes placed in the subdivision were single wides.

The judge found that the new zoning standards respecting mobile or prefabricated homes located outside of mobile home parks were by and large valid. Addressing the twenty-four-foot width requirement, however, he said that the concern cannot be health or safety because both the federal and state governments[2] permit the construction of

_____
[2] See National Manufactured Housing Construction and Safety

prefabricated homes less than twenty-four feet wide. The judge said the concern is aesthetics, but aesthetics would not justify application of a twenty-four-foot width requirement in this subdivision "already one-third full of fourteen foot wide trailers."

The judge ruled against Gackler because it had failed to establish that the restrictions imposed on the use of the Gackler property by the new zoning standards precluded use of the property for any purpose for which it was reasonably adapted.[3] Since the evidence indicated that the vacant lots would sell "for conventional or modular home occupancy if the asking price was realistic and if screening was provided for the existing mobile homes," the "plight of plaintiff here simply does not rise to the level of confiscation."

The Court of Appeals agreed and affirmed:

> [A]lthough plaintiff presented evidence that the lots could be sold for the asking price of $3,500 if the buyers could use single-wide mobile homes, there was contradictory testimony that the lots were far overpriced and that the lots could be (and had been) used for modular and custom built homes.[4]

We would reverse because Gackler had estab-

---

Standards Act of 1974, 42 USC 5401 *et seq.*, and the State Construction Code Act, MCL 125.1501 *et seq.*; MSA 5.2949(1) *et seq.* The federal regulatory scheme is extensive, covering a variety of areas involving health and safety, and interior and exterior specifications. The Michigan Mobile Home Commission has control of all phases of proposed mobile home use and of the mobile home industry under the provisions of the Michigan Mobile Home Commission Act, MCL 125.1101 *et seq.*; MSA 19.855(1) *et seq.*

[3] The judge referred to this Court's decisions in *Ed Zaagman v City of Kentwood,* 406 Mich 137; 277 NW2d 475 (1979), and *Kropf v Sterling Heights,* 391 Mich 139; 215 NW2d 179 (1974).

[4] *Gackler Land Co, Inc v Yankee Springs Twp,* 138 Mich App 1, 11-12; 359 NW2d 226 (1984).

lished, before the zoning ordinance was amended to prevent the use of the remaining back lots for single-wide prefabricated homes, a vested right to sell the lots for use as sites for single-wide prefabricated homes as a nonconforming use. We therefore find it unnecessary to comment on the standards enacted by the township after *Robinson Twp*, limiting the placement of mobile or prefabricated homes in residential zoning districts to those that are at least twenty-four feet wide and meet other criteria.[5]

A property owner who claims a vested right to a nonconforming use need not show that the land cannot feasibly be used in conformity with the changed zoning. The inquiry is whether the nonconforming use was established before the enactment of the zoning that would bar the use. If so, government may not interfere with the use without regard to whether the property can, consistent with the change in zoning, be used for another purpose.

I

Land development and building construction generally stretch out over a period of time. The question is at what point will a court recognize that the developer is entitled to protection from a change in zoning that would bar a use permitted when development or construction was commenced.

This Court has indicated that a vested right to a nonconforming use is established when there has been a tangible change in the land by excavation

[5] The disposition of this appeal we believe to be correct also makes it unnecessary to consider the other issues raised by the parties and amici curiae. We defer to another day the question whether single-wide prefabricated homes may be barred from *all* residential zoning districts other than mobile home parks.

and construction or work has been done of a "substantial character."[6]

A landowner who has reached a stage of substantial construction or action on the basis of existing zoning has the right to complete the development and to use the property in accordance with the zoning extant when the work was begun without regard to zoning amendments that thereafter become effective. Developers are thus assured that investments calculated on the basis of prevailing regulations will be protected.[7]

---

[6] *Bloomfield Twp v Beardslee,* 349 Mich 296; 84 NW2d 537 (1957); *City of Lansing v Dawley,* 247 Mich 394; 225 NW 500 (1929). In *City of Lansing,* this Court denied the right to proceed with construction of a building in violation of zoning because nothing had been done of a "substantial character towards the construction of the building" before notification that the building permit had been revoked under the new ordinance. The Court said there would have been no question that plaintiff would have been able to proceed with the building if he had done anything of a substantial character towards the construction of the building because he would then have created a vested property right which could not be destroyed by a subsequently enacted ordinance. The Court referred to a New York case, *Rice v Van Vranken,* 132 Misc 82; 229 NYS 32 (1928), in which a similar claim was asserted, and quoted with apparent approval language stating that the question is whether "there has been any tangible change in the land itself by excavation and construction."

The township rural zoning act provides for continuance of nonconforming uses. MCL 125.286; MSA 5.2963(16) states that a nonconforming use is "[t]he lawful use of . . . land [that is] existing and lawful at the time of enactment of [the] zoning ordinance, or, in the case of [the] amendment of an ordinance, then at the time of the amendment . . . ." A nonconforming use has been defined as a "use which lawfully existed prior to the enactment of a zoning ordinance, and which is maintained after the effective date of the ordinance although it does not comply with the use restrictions applicable to the area in which it is situated." 1 Anderson, American Law of Zoning, § 6.01, p 354. The nonconforming use must commence before the zoning restriction is imposed and be in existence when the zoning restriction is enacted.

[7] A developer invests in property with intentions to develop it according to current regulations. The price paid for the property reflects the developer's understanding of what he will be able to do with it—what public regulations will permit. Further investments in plans, engineering tests and drawings, and even site improvements are all based on what the devel-

Land is developed and buildings are constructed by private entrepreneurs for contemplated profit. The zoning of property often determines whether development or construction might be profitable. Absent the expectation of the contemplated profit, development and construction generally will not occur. The opportunity to earn the contemplated profit becomes an investment-backed expectation when the development reaches the point of substantial construction and cannot thereafter be thwarted or confiscated by a change in zoning on the premise that the property is not worthless as rezoned or could, consistent with the revised zoning, be devoted to a marginal or less profitable use.

A

Allowing that a nonconforming use with respect to the lots on which the eleven prefabricated homes had been installed might have been established, the township asserts that the right to a nonconforming use applies only to those lots on which prefabricated homes were in place at the time of the zoning change. There is no sewer service to a number of the back lots and no improvements specific to these lots. The township argues that the road construction, grading, and excavating were undertaken mainly for the benefit of the lakefront lots and do not justify permitting the nonconforming use of the remaining lots.[8]

---

oper perceives as legally permissible under prevailing laws and regulations. [Strom, ed, "Protection of Vested Rights in the Development Process: Recommended Actions," *1983 Zoning & Planning Law Handbook,* § 5.03, p 82.]

[8] The excavating work was for the immediate benefit of the lakefront lots; the back lots were graded so that the dirt could be moved onto the lakefront lots. The road benefits all the lots.

The sewer extends to the last prefabricated home on Lakeside Drive, but there is no sewer service to the last part of Lakeside Court.

We agree with Gackler that the subdivision development should be viewed as a whole, as a structure only part of which had been completed, analogous to a building that is partially completed or to a nonconforming use that is established in a portion but not in all of a building before an amendment to a zoning ordinance rendering such structure or use nonconforming. It has been said that "the extension of the nonconforming use is permissible if the design of the building indicates that at the time of the passage of the zoning restriction it was intended that the building be dedicated in its entirety to such use."[9]

Gackler had lawfully commenced this development in 1969—before the change in zoning—and substantial sums of money had been spent in carrying out the construction plan. The pattern of development in this subdivision was well established by the time the township adopted the amendatory ordinance in 1972.[10]

B

The Court of Appeals affirmed the circuit court

[9] 8A McQuillin, Municipal Corporations (3d rev ed), § 5.208, p 118.

In *Hawkinson v Itasca Co*, 304 Minn 367; 231 NW2d 279 (1975), the Supreme Court of Minnesota allowed a landowner to complete the second floor of a building, even though the area had been rezoned for residential use.

In *Keller v City of Bellingham*, 92 Wash 2d 726; 600 P2d 1276 (1979), the Supreme Court of Washington held that the addition of six electrolytic cells to manufacture chlorine to bring the building to the capacity of thirty-two cells as intended before a zoning ordinance barred manufacture in the area was not an enlargement of a nonconforming use.

[10] Lots 13-16, 18, 29, 31 and 34-37 had been put to use as sites for prefabricated homes. Gackler argues that these lots are not restricted to one area, such as the Lakeside Court cul-de-sac, but are placed "throughout" the vacant land west of the road. The township counters that there are only four vacant lots (17, 30, 32, and 33) between the lots with prefabricated homes and the remaining lots were not affected by the existing prefabricated homes.

decision ruling against Gackler on the nonconforming use issue, stating that the township did not know of the recorded restrictions permitting the use of the back lots for mobile or prefabricated homes when it approved the plat.[11] The knowledge of the township might be important if Gackler could only prevail on the theory that the township had misled it by conduct and was therefore estopped from taking contrary action.[12] Gackler, however, established a vested right to a nonconforming use on the basis of expenditures and development in the subdivision, not on the basis of conduct by the township.

II

Gackler relies on *Richards v City of Pontiac*, 305 Mich 666; 9 NW2d 885 (1943), where this Court found a vested right to continue operation of a trailer camp although in violation of a zoning ordinance because the owners had purchased the property and operated it as a trailer camp for one year before the enactment and subsequent amendment of a zoning ordinance and had spent $8,000 in improving the trailer camp. Gackler argues that in *Richards* there was no investigation whether each of the trailers in the park was in place before the passage of the ordinance; rather, the development was viewed as a whole. The township distinguishes *Richards* on the basis that the issue there did not concern a subdivision with individually platted lots, but a trailer camp.

[11] Gackler testified that the restrictions were presented to the township board in the spring of 1969 along with the plat for approval. The township asserted there were no restrictions incorporated in the plat when it was approved by the township board, and the township supervisor testified there was no mention of the restrictions in the board's minutes covering this period of time.

[12] See 4 Rathkopf, Zoning and Planning, § 50.04.

In *Patchak v Lansing Twp,* 361 Mich 489; 105 NW2d 406 (1960), the question was whether the nonconforming use applied to the entire fifteen acres of a trailer park owned by the plaintiffs or only to five acres. The trial court found that the trailer park was in operation only on the north five acres. The court noted that a license to oper-ate the entire fifteen acres as a trailer park had not been sought; the fee paid with the application for the license was $25, which was the fee for each ten acres or fraction thereof. *Patchak* does not compel the result sought by the township.

The disposition of this issue by other state su-preme courts is instructive. In *Sarpy Co Bd of Comm'rs v Petsch,* 17 Neb 263, 268; 109 NW2d 388 (1961), the Supreme Court of Nebraska held that an owner of a trailer court had acquired a vested right to a nonconforming use of a three-acre tract. Before the zoning ordinance, the owner had used part of the three-acre tract as a trailer park and had installed thirteen trailers and staked out spaces for fifty-nine trailers. Water and sewer lines, power and telephone lines were made avail-able for the entire tract. In allowing the owner to complete his project for fifty-nine trailers, the court said that "where a trailer-court project is partially completed when zoning regulations be-come effective, and the evidence is clear as to the extent of the project, the completed project will ordinarily determine the scope of the nonconform-ing use."

In *Blundell v West Helena,* 258 Ark 123, 131; 522 SW2d 661 (1975), the landowner purchased a five-acre tract. Twelve mobile home spaces were laid out on the east side. A twenty-foot road was built to serve those spaces and thirteen additional spaces were laid out on the west side. Subse-quently, a newly adopted zoning ordinance would

have barred use of the property as a mobile home park. Mobile homes had been placed on four or five lots before adoption of the zoning restrictions. The Supreme Court of Alabama allowed the completion and use of the twenty-five spaces because the spaces were actually leveled, the road between them was constructed, and water and sewer service were available. Although all twenty-five spaces had not been occupied by mobile homes, the court concluded that "their state of development at that time, constituted a use of the property for a mobile home park" under the "substantial use" test.[13]

---

[13] The court found no vested right with respect to a planned additional twenty-five spaces at another end of the tract because, due to a serious drainage problem, such use was a "long range future plan" as a possible third phase of development.

In *United Citizens of Mt Vernon v Zoning Bd*, 109 Misc 2d 1080; 441 NYS2d 626 (1981), a New York court discussed the extension or expansion of a nonconforming use with respect to the proposed construction of elderly housing on six acres of land remaining on a parcel of 29.5 acres that had previously been developed as a home for orphans. The proposed construction of the elderly housing was in violation of zoning enacted subsequent to the original development of the land. The court said that "if the extension or expansion of the non-conforming use forms an integral part of the original contemplation for the entire parcel, then the right to such extension or expansion becomes vested from the inception and is likewise constitutionally protected."

The New York court cited *In re Syracuse Aggregate Corp v Weise*, 72 AD2d 254, 257, 259; 424 NYS2d 556 (1980), aff'd 51 NY2d 278, 285; 434 NYS2d 150; 414 NE2d 651 (1980), where the court allowed the owner to excavate an entire twenty-five-acre parcel although only five acres had been excavated before the passage of the prohibitory ordinance. There the court said that whether a nonconforming use may be extended depends on " 'whether the nature of the incipient nonconforming use, in the light of the character and adaptability to such use of the entire parcel, manifestly implies an appropriation of the entirety to such use prior to the adoption of the restrictive ordinance. . . . Special term erred in its application of the rule that nonconforming uses may not be expanded, implementing a blanket rule that no additional land, beyond that utilized as of the time the ordinance became effective, may ever be entitled . . . .' "

The Utah Supreme Court, in *Wood v North Salt Lake*, 15 Utah 2d 245; 390 P2d 858 (1964), held that where a developer had installed water and sewer lines for each lot in an approved plat, he had the

In *Eklund v Clackamas,* 36 Or App 73, 82; 583 P2d 567 (1978),[14] the Oregon Court of Appeals ruled that a land developer had "established a vested right to complete" as a nonconforming use the fourth stage of a subdivision development where a water system capable of supplying water to houses to be built in the fourth stage had been completed, and the water supply line had been laid up to the land comprising the fourth stage. In the instant case, the paved road had been laid throughout the Gackler subdivision and other work had been done.

It is apparent that a land developer may acquire a vested right to a nonconforming use of improved vacant lots if the developer has the same kind of investment-backed expectation in a nonconforming use of improved lots that the owner of a nonconforming structure might have. A property owner is deemed to have acquired a vested right to a nonconforming use when he has made substantial expenditure in respect to the improvement of the property before the change in zoning.

III

Under each of the tests stated by the courts—"substantial use," "tangible change in the land," "integral part"[15]—Gackler had acquired a vested right to sell for use as sites for single-wide prefabricated homes all the back lots that had been improved with a paved road.

right to develop lots of 6000 square feet as permitted when the plat had been approved, but which would not conform to a zoning amendment that raised the lots size minimum to 7000 square feet.

[14] Overruled on other grounds, *Forman v Clatsop Co,* 63 Or App 617; 665 P2d 365 (1983).

[15] See *United Citizens of Mt Vernon v Zoning Bd, supra.*

A

Gackler's recorded plan of development contemplated sale of the lakefront lots for site-built houses and the back lots for mobile or prefabricated homes. The road was constructed and other improvements were made on the basis of that plan.

The remaining back lots could, indeed, as the Court of Appeals observed, be used consistent with the recorded restrictions either for site-built or mobile or prefabricated homes. It is apparent, however, from the recorded restrictions placed on the land, that Gackler expected to market the back lots for mobile or prefabricated homes. The placement of single-wide prefabricated homes on eleven lots before the change in zoning substantiates that purpose.

After eleven lots were devoted to the single-wide use, the remaining back lots were in a subdivision that had taken on the ambiance of a single-wide prefabricated home subdivision. The presence of single-wide prefabricated homes in the subdivision might be a positive factor for a potential buyer interested in purchasing a lot for a single-wide prefabricated home, but might be a negative factor for a potential buyer who might otherwise be interested in purchasing a lot to construct a site-built home.

All appear to agree that while the back lots could indeed have been used for site-built houses, and might have been saleable as sites for site-built homes if the price of the lots were reduced, they were more valuable if they could be used for a single-wide prefabricated home. Inherent in the concept of a vested right in a nonconforming use is that the landowner is not limited to the value that

would be realized upon use in a manner conforming to the change in zoning.

### B

The asserted justification for the twenty-four-foot-wide requirement is aesthetics, not health or safety.[16] Implicit in that justification for requiring a width greater than fourteen feet should be recognition that once a subdivision has taken on the character of a single-wide prefabricated home subdivision, the remaining lots will be more readily saleable for single-wide prefabricated homes than for double wide or site-built homes.

Where land has been subdivided and improved as sites for single-wide prefabricated homes, there have been substantial expenditures for land improvements, and single-wide prefabricated homes have been placed on the land before a change in zoning, the land developer has established a vested right to use all the lots so subdivided and improved as a nonconforming use.

Land is developed for a specific use or market. Roads and other costly improvements are installed on the basis of existing zoning because zoning is a major factor in deciding whether the economics justify making any improvements at all. Just as an owner or builder relies on the existing zoning in commencing construction of a building, expecting to be able to use it upon completion for a particular use, a land developer, in constructing roads or other improvements, also relies on existing zoning

---

[16] As the circuit judge observed, it cannot seriously be suggested that a fourteen-foot-wide home is a threat to public health or safety.

There are many apartments and townhouses in major cities where land is valuable, with units less than fourteen feet wide, and where the value of a $14' \times 70'$ unit would be a number of times the value of a double-wide prefabricated home located on a desirable site in rural or urban Michigan.

and expects to be permitted to sell the improved lots for the use permitted by the zoning when he begins substantially to improve the land.

When Gackler began substantial construction of the road and other improvements on the basis of the existing zoning, which permitted sale of the lots for use as sites for single-wide prefabricated homes, it made the kind of substantial expenditure that requires a finding that a vested right to a nonconforming use of the back lots was established.

### IV

The majority opinion states that because the road, sewer and other improvements to Gackler's property made the back lots "as suitable for 'dwellings' under the ordinance as they are for single-wide mobile homes," there is "no concrete manifestation that development of the plat was dedicated in its *entirety* to the use as sites for single-wide homes."[17] (Emphasis in original.) It is stated, similarly, that the improvements "rendered the lots in the plat equally suitable for the placement of single-wide mobile homes and conventional dwellings" and therefore the improvements "do not constitute work of a substantial character which makes apparent an actual use of the plat as a single-wide mobile home plat."[18] It is said that Gackler is seeking "preservation of an option to sell the unsold lots as sites for *future* nonconforming uses"[19] (emphasis in original) and that "the use of the *entire* plat as a single-wide mobile home

[17] *Ante,* pp 575-576.
[18] *Id.,* p 576.
[19] *Id.,* pp 577-578.

plat rests solely within the owner's contempla-
tion."[20] (Emphasis in original.)

A

The nature of sewer, water, and road improve-
ments is that they may be adapted to more than
one use. Sewer and water mains and roads are
needed for commercial, industrial, and residential
uses. It is not a sufficient response to a land
developer who has made expenditures for such
improvements in reliance on existing zoning to say
that the improvements have made the land as
"suitable" or even "equally suitable," however
that might be defined, for a use consistent with the
change in zoning as a use permitted under the
former zoning.

Suppose a foundation for a high-rise office build-
ing is completed before a change in zoning. Or
that sewer or water mains and roads are installed
before a change in zoning increasing minimum lot
size from 80 to 120 feet. A foundation for a high-
rise office building might and probably would be
suitable for another use, say a high-rise apartment
building. Sewer and water mains and roads con-
structed when zoning permits 80-foot lots are suit-
able (or equally suitable) for 120-foot lots. See
*Wood v North Salt Lake,* 15 Utah 2d 245; 390 P2d
858 (1964), discussed in n 13.

Construction of those improvements might and
most likely would not, however, have been eco-
nomically justified where the land so improved is
located if an apartment house must be constructed
on the foundation rather than the contemplated
office building or if the minimum lot size is 120
feet rather than 80 feet.

Suppose the community changes the minimum

[20] *Id.,* p 578.

floor area of the home that may be constructed. When the sewer, water, road and other land improvements were made, the minimum floor area was 1,000 square feet, now it is 1,500 square feet. There might not be a market or as good a market in the area for homes of 1,500 square feet at a price that justifies the investment. Had the developer known that he would be required to build 1,500 square-foot houses, he would not have invested a dime in the land improvements.

Suppose the community decides, after sewer, water, road and other land improvements have been made, that there is a need for low-cost housing, and changes the zoning so that in the future homes cannot be built on the land so improved having a floor area in excess of 1,000 square feet. Again, from an economic standpoint, the developer might not have developed the land at all if that limitation had been imposed before he made his investment.

A developer, whether building structures above the ground or making underground or surface improvements, decides initially whether to invest at all in part on the basis of existing zoning. Just as a landowner might not invest in sewer or water mains or roads if the zoning provides for a minimum of 120-foot lots, a minimum of 1500 square feet, or a maximum of 1000 square feet, and the developer of a high-rise office building might not have proceeded if he could only build a high-rise apartment building, so too Gackler might not have proceeded to develop the back lots or the subdivision at all with road and other improvements unless it could market the back lots as sites for single-wide prefabricated homes. Gackler's investment-backed expectation is as much entitled to protection as a lot developer confronted with a

change in lot size or floor area or an office building
developer.

Until a home is actually under construction, no
lot developer can make "apparent"[21] at the site an
actual use of a lot. Until construction is under
way, he could bow to a requirement increasing lot
size from 80 to 120 feet, minimum floor area from
1,000 to 1,500 square feet, or establishing a maxi-
mum floor area of 1,000 square feet. Requiring an
"apparent" actual use of each lot would mean that
the investment-backed expectations of a lot devel-
oper cannot, until a home is actually under con-
struction, give rise to a vested right in a use
permitted when the investment is made.

B

Gackler's effort in this litigation to secure the
right to sell the back lots as sites for the construc-
tion of single-wide prefabricated homes has been
characterized in the majority opinion as an effort
to preserve an option to sell the unsold lots as
sites for "future" nonconforming uses. Whenever a
structure is under construction and has not been
completed before the change in zoning occurs, the
proposed use will be inchoate at the time the
change in zoning is enacted. Merely because the
use has not come into fruition does not constitute
it a "future" nonconforming use.

The nature of land development is such that
unsold lots will, in a sense, always be sites for
future uses. This Court cannot in principle justifi-
ably deny to land developers the same protection
of their expenditures made on the basis of existing
zoning as is secured to persons who make land
improvements above the ground. Merely because a
land developer might change the contemplated

[21] *Id.,* pp 576-577.

use, in whole or in part, to a use permitted by the change in zoning does not justify denying him protection if he wishes to develop the land in accordance with the zoning as it was when he made his investment. Although dwellings have not been built on the "entire" plat before the change in zoning, development in accordance with the prior zoning does not rest "solely within the owner's contemplation."

C

While a high-rise office building developer would have plans and a building permit showing that he intended to construct an office building, a land developer will be able to point to other evidence— as can Gackler—of his intention to use the land for a use permitted by the former zoning no longer permitted as a result of the change in zoning.

Gackler's intention to use the entire plat as a single-wide prefabricated home plat did not rest solely within its contemplation. Single-wide prefabricated homes had been placed on eleven back lots by the time the change in zoning occurred. The recorded restrictions permitted construction on back lots of prefabricated homes and did not permit the construction of prefabricated homes on the lakefront lots. Gackler, of course, might have restricted the use of the back lots to the construction of prefabricated homes, but that would have been, in a sense, bootstrapping.

It is, I think, clear that Gackler planned the development of the back lots with prefabricated homes when it recorded the restrictions. Be that as it may, when it sold eleven lots for the construction thereon of prefabricated homes, it gave the area the ambiance or character of a prefabricated-home subdivision. Gackler had both invested in

the construction of a road and utility lines, and had given the area a certain character before the change in zoning.

D

The underlying rationale of the vested right/ nonconforming use exception is that a property owner should be protected in making an investment on the basis of existing zoning to improve the land. Many nonconforming uses could be adapted by the expenditure of money, and some without any financial expenditure, to a use consistent with a use permitted following the change in zoning. Nevertheless, the owner is not required to change the use or to incur any financial loss.

A dwelling house in a residential neighborhood might have been converted into a small neighborhood store before there was any zoning. The store could readily be converted back to a dwelling. The owner is not required to do so merely because the structure is suitable for use as a dwelling and could be readily reconverted for that use.

Gackler's selling experience indicates that it will suffer an economic loss if required to sell the back lots in conformity to the change in zoning. Instead of the price obtainable if the back lots can be sold as sites for single-wide prefabricated homes, it will obtain a lesser amount upon their sale for site-built homes. There is no difference in principle between requiring Gackler to reduce the price of the lots so that they can be sold for the construction of site-built homes than in asking the owner of any other nonconforming use to adapt it so that it can be used consistent with the change in zoning.

Gackler is asked, as might the owner of any nonconforming use, to take an economic loss after

an investment in the property on the basis of existing zoning has been made so that the community can bring about a different kind of development or use than was formerly permitted. There is no difference between asking Gackler to pay for the cost of installing screening, as suggested by the trial judge and referred to in the majority opinion, to hide the existing prefabricated homes than in asking the owner of the foundation for a high-rise office building or of the house converted into a store to make the changes that are needed so that the foundation can be used for an apartment building and the store once again as a dwelling.

All such changes could be made. It is just a question of money. But that is what vested rights/nonconforming uses are about—money, the owner or land developer's money. If one focuses on the concept that an investment made on the basis of existing zoning should be protected, one will not indulge in artificial distinctions that ignore the underlying rationale of the vested right/nonconforming use exception.

E

A land or lot developer should be permitted to use the property for a use permitted when improvements are made unless[22] the court can properly find that the investment was made without regard to the zoning. This Court has no basis for concluding that Gackler would have constructed the road and other improvements if the back lots could not have been sold as sites for single-wide prefabricated homes.

Gackler's selling experience would suggest that

---

[22] We recognize that ordinarily when a nonconforming use is claimed no inquiry is made whether the property can be used in conformity with the new or revised zoning.

it would not have been a prudent investment to improve the back lots for construction of site-built homes. If Gackler is required to reduce the asking price to a "realistic price," as the majority opinion requires, Gackler's investment may, by virtue of the change in zoning and the majority opinion, become unrealistic.

We would reverse and remand for further proceedings consistent with this opinion.

WILLIAMS, C.J., concurred with LEVIN, J.

ARCHER, J., took no part in the decision of this case.