## Joseph B. BLUNDELL Jr. *v.*
## CITY OF WEST HELENA, ARKANSAS

75-22                                   522 S.W. 2d 661

Opinion delivered May 19, 1975

*David Solomon,* for appellant.

*Ralph C. Murray,* for appellee.

JOHN A. FOGLEMAN, Justice. This appeal brings into sharp focus the conflict between private property rights and the right of municipal government to control the owner's use of property. The particular question is the extent to which an owner has freedom to the use of his property after the adoption of a zoning ordinance which results in the use not being in conformity with uses permitted in the area in which it is located. The particular question is without precedent in this state and it presents the usual difficulties experienced in achieving the appropriate balance between right of an individual to free use and enjoyment of his property and equally important rights of society in the interest of the public welfare.

On August 3, 1965, appellant purchased a five-acre tract of land lying along Springdale Road between the city limits of Helena and those of West Helena. In 1966, he began developing the tract as a mobile home park. The topography of the tract was such that development was started on the east side, where 12 mobile home spaces were first laid out, after which a 20-foot road to serve these lots and 13 others was con-

structed and the 13 additional spaces were laid out on the west side of this road. The ground level was much lower west of these spaces and a septic tank to serve these 25 spaces was placed in this area.

Sometime in October, 1966, the first mobile home was placed on one of the first 12 lots. Water was available to these lots by a connection to the Helena water system. Electricity was also available. Problems developed with reference to the sewer system and the state health authorities restricted occupancy to no more than four mobile homes with the existing sewer system and recommended connection to a city sewer system. Appellant found the cost of connection to the Helena sewer system prohibitive and no West Helena sewer lines were available.

Sometime in 1968, appellant employed Cline-Frazier Consulting Engineers, who completed detailed plans in June, 1968, for further development of appellant's property, which was then named Springdale Village Trailer Park, and was to consist eventually of a total of 44 lots. These plans were submitted to the Arkansas State Board of Health on June 13, 1968, and approved by its Bureau of Environmental Engineering on June 17, 1968.

On February 17, 1969, the County Court annexed appellant's property, with other lands, to the City of West Helena and the order of annexation was finally affirmed here on February 22, 1971. See *Kalb* v. *City of West Helena,* 249 Ark. 1123, 463 S.W. 368. On December 8, 1971, the City of West Helena adopted Ordinance 1020 to govern zoning in the annexed area. By this ordinance, this property of appellant Blundell was classified as "Residential R-A" making its use as a mobile home park non-conforming because such parks are permitted only in commercial zones in West Helena. West Helena sewer lines had been extended to the property in September 1971, and appellant granted the city a 20-foot easement for these lines. He then disconnected his septic tank system and made connection with the city sewer line. After continued development of the property, Blundell's application to the City of West Helena for a permit for an electrical connection, i.e., for the placing of a meter and furnishing of

electricity on one of the first 25 lots laid out, but not one of the first 12, was rejected in January 1974, on the ground that this would be an extension of a non-conforming use. Blundell then brought this suit to require the issuance of the permit and to establish his right to continue his development of his entire tract of land, or in the alternative, the first 25 lots, as a mobile home park.

The chancery court resolved the conflict in favor of the community's interest in public welfare and development and against Blundell's interest in the use of his property, denying him any relief and holding that the extension of the use of the facilities beyond the first 12 lots would be an impermissible extension of a non-conforming use. We disagree with the learned chancellor as to the particular space involved and as to all the first 25 lots but not as to any contemplated use of the remainder of the property for mobile home spaces.

The chancellor is to be commended for his exhaustive study of legal authorities and of the record. As a result the issues are brought into sharp focus. Portions of his opinion set out pertinent facts and issues. Among other things, he said:

> ....it is apparent that the plaintiff purchased this five-acre tract with the intention of utilizing all of it as a trailer park to accommodate some forty-four trailers. All his actions in employing engineers to plan and advise and prepare a plat for that development confirm this. At the time his land was annexed and zoned by the City of West Helena. . . he had only four or five lots actually in use for the intended purpose. His delay in extending further by that time was due in part to difficulty encountered with septic tank systems and financial inability to connect with existing sewer lines. Whatever the reason, the fact remains that at the time of the enactment in question his actual use was thus limited and he has extended that use since that date to include 12 such lots, all located on a line extending north and south along his east line. . .

> It is plaintiff's position that his purpose at the time of purchase coupled with investment of funds in his contemplated expansion extends his use to the full limit of

the tract. It is the position of the city that he is limited to the area actually appropriated for that use at the time of the enactment.

*****

These basic concepts are not seriously questioned here. What plaintiff does question here is the power of the City to restrict his prior use to the area of actual use prior to the enactment. It is his position that the City cannot so restrict him but must under the ordinance and the circumstances permit him to enlarge his use to the full limits of his tract; that his actual appropriation of a part of the tract for this use prior to the enactment, coupled with his contemplated full use and expenditures give him that right.

. . .[T]he vast weight of authority supports the sounder view that the purpose of all such legislation is to channel the growth and development of the community for the best interest of all its citizens, and that prohibited uses, though permitted to remain, should be diminished, restricted and discouraged rather than nurtured and expanded.

The courts appear to be in agreement that this intention and purpose must be found within the particular enactment and if clearly stated therein should be given effect in accomplishing that purpose to the extent therein expressly provided.

The courts appear to be in universal agreement that such legislation, being in derogation of common law, must be construed most strictly in favor of the landowner in every respect, including the determination of the restriction and its extent.

We differ with the chancellor very little as to the principles he stated. The real basis of our difference is in the application of these principles to the facts in the case. The chancellor's opinion is bottomed to a great extent upon language of the West Helena zoning ordinance relating to

non-conforming uses. Pertinent provisions are as follows:

Section 2. Definitions. M — Non-conforming. A building or a use of land existing at the time of enactment of this Ordinance, and which does not conform to the regulations of the District or the Zone in which it is situated.

*****

Section 18. Non-conforming Use and Structures.

1. Alterations, repairs, restoration:

A. Any non-conforming structure or portion thereof declared unsafe by proper authorities may be restored to a safe condition after being recommended by the Planning Commission and approved by the City Council.

B. Any non-conforming structure may not be reconstructed or structurally altered during its life to an extent exceeding an aggregate cost 66% of the appraised value at the time of the construction of the building, unless said building is changed to a conforming use.

C. No structure damaged by fire or other causes to the extent of more than 66% of its fair sales value immediately prior to damage shall be repaired or rebuilt excepting to conform to the regulation of this Ordinance.

2. Extension of Non-conforming Use:

A. A non-conforming use shall not be extended, but the extension of a lawful use to any portion of a non-conforming structure which existed prior to the enactment of this Ordinance shall not be deemed an extension of such non-conforming use.

3. Discontinuance and Change

A. Whenever a non-conforming use has been

discontinued for a period of six (6) months, such use shall not thereafter be reestablished, and any future use shall be in conformity with the provisions of this Ordinance.

The chancellor emphasized the language in the ordinance relating to non-conforming structures, but we place emphasis upon the title of Section 18 designating use and structures separately and the fact that only an extension of non-conforming *use* is prohibited. Likewise, we do not attach the significance the chancellor did to the provisions relating to discontinuance of a non-conforming use, because the facts, as we see them, do not disclose any such discontinuance of use in this case.

Let it be clearly understood that we do not consider that either the intention of the landlord to use the property for a mobile home park or the development of plans for doing so is sufficient to establish a permissible non-conforming use.

The first 25 spaces were actually levelled and laid out and the road between them constructed and gravelled in 1966. Gravel for driveways, sewer lines and water lines were then provided and connected to the first 12 spaces. Water was provided by the Helena system. Blundell testified that the water and sewer were available to the other 13 lots and that the only things that would have prevented occupancy of these lots by mobile homes were the sewer problem and the absence of an electrical connection. It was useless to provide this until the sewer problem was solved. Grading and levelling of all the first 25 lots by bulldozer was done at the same time. The septic tank was also constructed at this time. It was after all this was done that the State Health Department limited actual use to three or four spaces, because of soil conditions and advised Blundell that he should connect to the city sewer line. After the sewer connection was made in September 1971, the road on which the 25 lots were located was paved with concrete and concrete driveways and patios were poured for the first 12. Lots had not been previously paved because of uncertainty about ultimate location of sewer lines and manholes to effect the connection to the city system.

Blundell said that some fill had been necessary on lots 13

through 25 due to the rugged terrain and to the fact that he had experienced some difficulty with soil washing there, due in part to the fact that they were unoccupied. He said that the weight of house trailers would pack the soil. He also testified that when the connection with the city sewer system was made, the existing sewer line did not have to be moved or repaired except in one spot. He also testified that he had worked continuously to improve the looks of the park by growing grass and planting shrubs. Blundell testified that he had a total investment of $50,000 in the whole five-acre tract and that he had obtained financing for development by borrowing from a bank. He said that the present value of the property represented one-third to one-half of his investment and that the actual money invested amounted to $30,000, about $25,000 of which was for improvements. Of this about $8,000 to $10,000 was spent for concrete after the passage of the ordinance.

The lower lands on the west side had been merely cleaned out and a road used only for ingress and egress placed there in 1966. Nothing further had been done to develop the property at the time of the trial.

In construing the city ordinances and their effect, we must remember that zoning ordinances, being in derogation of the common law, must be strictly construed in favor of the property owner and that, under our constitution, the right of private property is regarded as before and higher than constitutional sanction. See *City of Little Rock* v. *Williams*, 206 Ark. 861, 177 S.W. 2d 924; *Poole* v. *State*, 244 Ark. 1222, 428 S.W. 2d 628; Art. 2, § 22, Constitution of Arkansas. Attempts to deprive the owner of a preexisting use have been regarded as unconstitutional as a taking of property without compensation or in violation of due process of law. *Silver* v. *Zoning Board of Adjustment*, 435 Pa. 99, 255 A. 2d 506; *Hoffmann* v. *Kinealy*, 389 S.W. 2d 745 (Mo., 1965); *McCaslin* v. *City of Monterey Park*, 163 Cal. App. 2d 339, 329 P. 2d 522 (1958); *City of Corpus Christi* v. *Allen*, 152 Tex 137, 254 S.W. 2d 759 (1953); *O'Connor* v. *City of Moscow*, 69 Idaho 37, 202 P. 2d 401, 9 ALR 2d 103 (1949). See *City of Little Rock* v. *Sun Building & Development Co.*, 199 Ark. 333, 134 S.W. 2d 582. See also, *Amereihn* v. *Kotras*, 194 Md. 591, 71 A. 2d 865 (1950); *People* v. *Miller*, 304

N.Y. 105, 106 N.E. 2d 34 (1952).

When we consider this ordinance, in this light, we prefer what has been referred to as the "substantial use" test for determining whether the use of property is an existing use at the time of adoption of a zoning ordinance to the extent that the use may be continued thereafter.

At the time of the adoption of the zoning ordinance, the street on which spaces 13 to 25 were located had been paved. Water and sewer service were available to them. The problem about sewage disposal which had prevented occupancy of the property had been solved. Although it is true that none of these spaces had ever been occupied by a mobile home, the first 25 spaces, considering their state of development at that time, constituted a use of the property for a mobile home park under this test.

It is widely recognized that a property owner has vested rights in a non-conforming use of his property. An apt articulation of the rule governing the vesting of such rights, as we apply it to the facts of this case, is found in the following language of the Kentucky Court of Appeals in *Darlington* v. *Board of Councilmen*, 282 Ky. 778, 140 S.W. 2d 392 (1940);

> . . . The mere ownership of property which could be utilized for the conduct of a lawful business does not constitute a right to so utilize it *(Cayce* v. *City of Hopkinsville*, 217 Ky. 135, 289 S.W. 223) which cannot be terminated by the enactment of a valid zoning ordinance, as such a concept involves an irreconcilable contradiction of terms. It would seem, therefore, that the right to utilize one's property for the conduct of a lawful business not inimicable to the health, safety, or morals of the community, becomes entitled to constitutional protection against otherwise valid legislative restrictions as to locality, or, in other words, becomes "vested" within the full meaning of that term, when, prior to the enactment of such restrictions, the owner has in good faith substantially entered upon the performance of the series of acts necessary to the accomplishment of the end intended.

The substantial use test requires that the steps taken toward implementation be of a substantial nature or involve substantial investment or substantial obligations on the part of the owner. See cases cited infra.[1]

Particular applications of the constitutional principles governing vested rights in non-conforming uses have been applied in cases involving mobile home or trailer parks. Vested rights entitled to constitutional protection have been held to exist when there has been a substantial establishment and development of land for use as such a park. *Kessler* v. *Smith* v. *Village of Glenwillow*, 104 Ohio App. 213, 142 N.E. 2d 231 (1957) aff'd. sub. nom; *Smith* v. *Village of Glenwillow*, 146 N.E. 2d 308 (Ohio 1957).[2] The vested property right has been recognized in such developments where the utilization of the premises is such that they may be known in the neighborhood as being employed for the conduct of that business, and where a trailer court project is partially completed when zoning regulations become effective and evidence as to the extent

---

[1]Some of the cases cited supra involve the principle here stated but relate to buildings. There is no sound reason why any distinction, insofar as legal principles are concerned, should be made between non-conforming use of land and non-conforming use of buildings, as the property rights of use and enjoyment are the same and are entitled to the same constitutional protection. *Hoffmann* v. *Kinealy*, 389 S.W. 2d 745 (Mo., 1965). Mobile home parks, used car lots, automobile parking lots, lots for open storage of building materials, construction equipment and airplane landing strips are all examples of uses and enjoyment of property which may prove more valuable to the owner when there are no buildings on them than when there are.

[2]In *Kessler*, the owner had expended substantial sums of money and considerable effort in the purchase and development of an eight-acre tract for trailer park purposes. When he purchased the property and commenced development the area was not subject to any building ordinance or zoning law. He had obtained approval of plans for sewage treatment and had employed a firm of architects to prepare a complete set of plans for construction. He had purchased a well digger and concrete pipe for water supply and sewer facilities and brought in a bulldozer to fill a ditch and grade the land, and purchased concrete blocks for construction of a utility building, a septic tank and filter bed. At the time of the passage of the ordinance, the utility building had been completed and the foundation constructed for the filter bed and the foundation and part of the walls of the septic tank had been built. The plans provided for 200 trailer spaces, but the operation was to start with only 28, which had been laid out and approaches for use completed with a road between 1600 and 1700 feet in length.

of the project is clear, the completed project will determine the scope of the non-conforming use. *Board of County Commissioners* v. *Petsch,* 172 Neb. 263, 109 N.W. 2d 388 (1961).[3]

We consider the steps taken by Blundell on the first 25 spaces' prior to the passage of the ordinance to have been substantial and to have involved substantial investment to the extent that he is entitled to use them as a mobile home park as a non-conforming use under the ordinance.

We are unable, however, to classify any of the lots other than the first 25 spaces as a part of the mobile home park in actual use sufficiently to vest any right in Blundell to develop it for occupancy by mobile homes or house trailers. There is no evidence to indicate that such a use of the property was not properly categorized as a long-range future plan. Blundell testified that the land was much lower than the first 25 lots, that there was a serious drainage problem to be solved and that,as a contemplated use, spaces would be laid out here as a third phase of development. Blundell referred to the area as the Valley. He proposes to fill the area in solving the drainage problem. The only attempt to make it usable was an unsuccessful effort to establish a nursery, which lasted only through one spring and summer.

The burden of proof is upon a property owner who claims rights by virture of a non-conforming use. *County of Saunders* v. *Moore,* 182 Neb. 377, 155 N.W. 2d 317 (1967). A mere contemplated use without active steps beyond preliminary work or planning or substantial investment to effectuate it is not sufficient to invest a property owner with property rights in a non-conforming use, or with a right to extend a non-conforming use. *Ohio State Students Trailer Park Cooperative* v. *Franklin County,* 123 N.E. 2d 286 (1953) affd., 123

---

[3]In *Petsch,* 29 trailer spaces had been put to use on a three-acre tract on which 59 spaces had been staked out. Water and sewer mains had been laid. Septic tanks had been installed consistent with use of the entire tract and power and telephone service were available to all 59 spaces. Eight trailers were installed on a north strip, five of which had been connected with power, telephone, water and sewer facilities, one with power and two without any services. In the northwest strip, five trailers had been installed with telephone, power, water and sewer connections. Sewer and water taps had been provided for 29 spaces in these two strips.

N.E. 2d 542 (Ohio App., 1953); *Lutz* v. *New Albany City Plan Commission*, 230 Ind. 74, 101 N.E. 2d 187 (1951); *Board of County Commissioners* v. *Petsch*, 172 Neb. 263, 109 N.W. 2d 388 (1961); *New York Trap Rock Corp.* v. *The Town of Clarkstown*, 1 A.D: 2d 890, 149 N.Y.S. 2d 290 (1956) affd., 3 NYS 2d 844, 144 N.E. 2d 725 (1957); *Smith* v. *Juillerat*, 161 Ohio St. 424, 119 N.E. 2d 611 (1954). Preliminary contracts or work which is not of a substantial nature is not sufficient to establish a vested right. *County of Saunders* v. *Moore*, supra.[4] The mere purchase of property with intention to devote it to a use is not sufficient in spite of preliminary work, such as clearing, grading and excavating, if that work is not of a substantial nature, or if the owner has not incurred substantial obligations relating directly to the use of the property. *City of Omaha* v. *Glissman*, 151 Neb. 895, 39 N.W. 2d 828. Appellant has failed to meet his burden of proof to establish a permissible nonconforming use for trailer spaces in Lots 26 through 44. That use would constitute an extension prohibited by the zoning ordinance.

Appellee argues that since appellant waited as long as he did to extend the actual use of spaces 13 through 25, he abandoned and discontinued any non-conforming use for more than six months, and that the placing of mobile homes on these spaces constitutes a prohibited reestablishment of that use under the ordinance. To embrace this theory would be inconsistent with the underlying theory of our holding on the question of existence of a non-conforming use. Blundell continued with his development of these spaces after the passage of the ordinance. His occupancy, prior to that time, had never exceeded eight units. The mere fact that his development of these spaces extended from September 1971 to January 1974 was not such an abandonment. Neither was the fact that there was apparently no demand for these spaces. To sustain the city's argument would require that we hold that in order to constitute use of the property in the sense of the ordinance,

---

[4]In *Moore*, there was one electric pole on the northeast corner of the property, and a well on a tract on which the owner had planned 110 lots. Preliminary work laying out roads had been done with a grader. There were no trenches, water or sewer pipes or poured concrete, no trailer houses were present and only one had ever been there. No trailer stalls had been completed and no water, electrical, telephone or sewage connections were available.

the use must be actual in the sense that the spaces must have been physically occupied by mobile homes. Such a construction would be unduly narrow and a strict construction favoring the city. We decline to give it this construction.

The decree is affirmed as to spaces 26 through 44 but reversed as to spaces 1 through 25. The cause is remanded for entry of a decree consistent with this opinion.

HARRIS, C.J., dissents as to the reversal.