Rene DUCHAC *v.* CITY of HOT SPRINGS

CA 98-1270                                          992 S.W.2d 174

Court of Appeals of Arkansas
Division II
Opinion delivered June 16, 1999

*John P. Lewis, P.A.*, by: *John P. Lewis*; and *Steve Westerfield*, for appellant.

*David H. White* and *Brian W. Albright*, for appellee.

S AM BIRD, Judge.  Appellant Rene Duchac appeals a decision of the Garland County Chancery Court granting the City of Hot Springs a permanent injunction against his use of the property at 605 Quapaw Street as a multi-family dwelling. Appellant contends that the court should not have granted the injunction because the property was a preexisting, nonconforming use when the zoning ordinance went into effect in 1963.  Appellant also argues that the City should be barred from enforcing the zoning ordinance by estoppel and laches.  The trial court held that the subject property was not a preexisting, nonconforming use.  It also held that neither laches nor estoppel applied to the situation, and granted the injunction.  We agree with the trial court and, therefore, affirm.

Dora Jane Ledgerwood Ellis, the daughter of C.H. Ledgerwood, who built the house in the 1920s, testified that it was converted from a one-family residence to a two-family residence sometime during the 1930s by turning a stairway around and

adding more bedrooms upstairs. During World War II, Ledgerwood rented the upstairs apartment to an army officer and his wife. After the war was over, the upstairs apartment remained empty, except for a while in 1945 when Ms. Ellis returned from college and lived upstairs, but the house was never converted back to a one-family home. Mrs. Ellis said she married in 1964 and moved out of the house. In 1966 the Ledgerwood family moved to a new house. Ms. Ellis said that at that time it was a single-family residence, and Ledgerwood sold the property to Zenonas Minginas sometime between 1966 and 1969.

June Smith, who lives next door to 605 Quapaw, testified that as soon as she learned that Duchac was using the property for apartments, probably around the mid-70s, she complained to the city, and has continued to complain through the years.

Tom Elgin, the Director of Planning and Development for the City of Hot Springs, testified that the first comprehensive zoning ordinance for the city was passed in 1963. It zoned the area in which 605 Quapaw is located as R-3, "Low Density Residential." An ordinance identical to the 1963 ordinance is still in effect. Nevertheless, he admitted that the house at 601 Quapaw, next door to 605, is a four-unit apartment house; 627 Quapaw is about a half block from 605 and is a six-unit apartment house; and diagonally across an alley to the rear of 605 is a three-unit apartment house. Furthermore, directly behind 605 is an automobile body-repair shop. Mr. Elgin did not know whether these other buildings had been non-conforming uses at the time the zoning was adopted, or whether variances had been granted for them.

Appellant testified that he bought the apartment house at 605 Quapaw in 1973 from Zenonas Minginas, and the house had a two-bedroom unit upstairs, a two-bedroom unit downstairs, a one-bedroom unit downstairs, and an efficiency apartment downstairs, which were all occupied. He said he would not have bought the property as a single-family dwelling. Duchac obtained a purchase-money mortgage characterizing the property as a hotel, and has never used it as a single-family unit. He said that he has always had 100% occupancy, that he lived there himself for a while, and that he later used part of the house as his CPA and Real

Estate office. Mr. Duchac also testified that each year since he purchased the property he has paid the City an "occupancy tax," and the City has never returned his money.

Over the years, Duchac said, the house has required maintenance to the plumbing, kitchens, bathrooms, and electrical system. If the City had informed him in 1970 that the house could not be used as an apartment building, he would not have purchased it, and if he had known "a couple of years later," he wouldn't have spent money on needed electrical and plumbing upkeep. He said it would cost him "a fortune" to turn the house back into a single-family dwelling. Stairwells, walls, and appliances would have to be moved, and it would be "totally cost prohibitive."

Appellant also testified that he had talked to Zenonas Minginas about the history of the house when he purchased it, but Minginas died around 1980, and appellant had no access to the records regarding Minginas's tenants. Appellant said he had been able to locate only one of the tenants who lived in the house when he purchased it. He complained that the delay by the City of almost thirty years had greatly diminished his witness list because so many who were familiar with the early history of the house had died or moved away.

Zenonas Minginas's son, John Minginas, testified for appellant by deposition, stating that his father purchased the property as an apartment building, moved into the house in January 1969, and it had three mailboxes in the carport, evidencing its use as a multi-family dwelling. At that time, the lower floor of the house had a large living room, a kitchen, a bathroom, a bedroom, and an intermediate room, which could be used for a bedroom. Zenonas Minginas subsequently divided the living room with partitions into two sleeping rooms and a bathroom, and the occupants shared the kitchen with the family living in the larger downstairs area. Upstairs there was a living room, kitchen, two bedrooms, and a bathroom. The only way to get upstairs was from the outside; there was no connection by which a person could go into the main house downstairs and get to the upstairs apartment. John Minginas insisted that his father purchased the house for use as rental property.

Appellant first argues that the trial court erred in granting the permanent injunction because the property was exempt from the 1963 zoning ordinance as a preexisting, nonconforming use. He relies on *Blundell v. City of West Helena*, 258 Ark. 123, 522 S.W.2d 661 (1975), where the court recognized:

> [Z]oning ordinances, being in derogation of the common law, must be strictly construed in favor of the property owner and . . . under our constitution, the right of private property is regarded as before and higher than constitutional sanction. Attempts to deprive the owner of a preexisting use have been regarded as unconstitutional as a taking of property without compensation or in violation of due process of law. . . . [W]e prefer what has been referred to as the "substantial use" test for determining whether the use of property is an existing use at the time of adoption of a zoning ordinance to the extent that the use may be continued thereafter.

258 Ark. at 130-31, 522 S.W.2d at 666 (citations omitted).

Appellant argues that, although the upstairs apartment was not occupied for several years after World War II, the character of the house as a multi-family dwelling was not changed. Therefore, when the ordinance was passed in 1963, the house was a nonconforming use.

The chancellor relied on *Anderson v. City of Paragould*, 16 Ark. App. 10, 695 S.W.2d 851 (1985). Anderson had lived in a mobile home on his lot when a zoning ordinance against trailers became effective, so his home qualified as a preexisting, nonconforming use. Appellant removed the mobile home from his lot and traveled for almost a year between 1983 and 1984. He returned to Paragould and sought a zoning variance to build an apartment building on the lot. When it was denied, Anderson moved another mobile home onto the lot. The Arkansas Supreme Court held that because the Paragould zoning ordinance contained a clause stating that a discontinuance of the preexisting, nonconforming use for over thirty days constituted an abandonment, Anderson lost the right to exercise the preexisting, nonconforming use. The court said, "Where the ordinance in question contains a discontinuance time limitation, courts have held that such nonexercise of the nonconforming use is sufficient, of itself,

to terminate the nonconforming use, regardless of intention to abandon." 16 Ark. App. at 12, 695 S.W.2d at 852.

Article 3-7 in the Hot Springs Zoning Code, provides:

> A nonconforming use of land or a nonconforming use in a structure designed for a conforming use shall not be restored to a nonconforming use after such nonconforming use has been discontinued for 12 months.

Based on this ordinance and the evidence before him, the chancellor held that the multi-family use of the property during World War II was discontinued for a sufficient period of time prior to the passage of the city zoning code in 1963 to constitute an abandonment.

In appellate review of ordinary equity cases there are two different components of the chancellor's ruling that are considered. The appellate court will not set aside a chancellor's finding of fact unless it is clearly erroneous. Ark. R. Civ. P. 52. This deference is granted because of the regard the appellate court has for the chancellor's opportunity to judge the credibility of the witnesses. *City of Lowell v. M & N Mobile Home Park, Inc.*, 323 Ark. 332, 916 S.W.2d 95 (1996). However, a chancellor's conclusion of law is not entitled to the same deference. If a chancellor erroneously applies the law and the appellant suffers prejudice, the erroneous ruling is reversed. Manifestly, a chancellor does not have a better opportunity to apply the law than does the appellate court. *Id.* The issues in this case turn on questions of fact rather than questions of law, and we find that the chancellor's conclusion that the nonconforming use of the building had been abandoned before the ordinance took effect is not clearly erroneous.

Ms. Ellis testified that she had lived in the house until 1964 and it was a single-family residence at that time. On cross-examination, Ms. Ellis was asked:

> Q.     Now, if John Minginas testified that when they bought the property it was two living units downstairs and one living unit upstairs, would you know how that got to be that way?

> A.     No, there were not two living areas downstairs because we lived there ourselves, period.

She also insisted that there was only one mailbox for the house, and on redirect examination said that when her family sold the property, it was a single-family residence. This testimony supports the chancellor's finding that the character of the house had returned to a single-family dwelling and existed in that form at the time the City zoning ordinance was passed in 1963.

██ ██ Next, appellant argues that the City should be barred from obtaining or enforcing the injunction because it waited more than thirty-five years to challenge the multi-family use of the house. He contends that the equitable principles of estoppel and laches apply. Our supreme court has held that estoppel can be applied against a city. *See Miller v. City of Lake City*, 302 Ark. 267, 789 S.W.2d 440 (1990). In *City of Russellville v. Hodges*, 330 Ark. 716, 957 S.W.2d 690 (1997), our supreme court set out the elements of estoppel:

> Four elements are necessary to establish estoppel. They are: (1) the party to be estopped must know the facts; (2) the party to be estopped must intend that the conduct be acted on or must act so that the party asserting the estoppel had a right to believe it was so intended; (3) the party asserting the estoppel must be ignorant of the facts; and (4) the party asserting the estoppel must rely on the other's conduct and be injured by that reliance. *State v. Wallace*, 328 Ark. 183, 941 S.W.2d 430 (1997); *Foote's Dixie Dandy, Inc. v. McHenry*, 270 Ark. 816, 607 S.W.2d 323 (1980). Additionally, we have specifically held that a sovereign is not bound by the unauthorized acts of its employees. *Arkansas State Highway Comm'n v. Townsend*, 313 Ark. 702, 858 S.W.2d 66 (1993); *Miller v. City of Lake City*, 302 Ark. 267, 789 S.W.2d 440 (1990); *Hankins v. City of Pine Bluff*, 217 Ark. 226, 229 S.W.2d 231 (1950). On appeal, we do not reverse a chancellor's findings of fact unless they are clearly against the preponderance of the evidence. *Thompson v. Potlatch Corp.*, 326 Ark. 244, 930 S.W.2d 355 (1996).

330 Ark. at 719, 957 S.W.2d at 691-92. The trial court also cited *Hope Educ. Ass'n v. Hope School Dist.*, 310 Ark. 768, 839 S.W.2d 526 (1992), which applied the same elements of estoppel, with a few wording changes, to a sovereign. In applying these elements of estoppel to the facts of this case, the chancellor found they were not all satisfied.

Appellant challenges that finding, arguing that all the elements of estoppel *were* present. The first element of estoppel is that the party to be estopped must know the facts. Appellant submits that the first element is satisfied since the City knew the zoning ordinances, (2) the City had received complaints about his use of the house as a multi-family dwelling, (3) he had paid occupation taxes on the nonconforming use since 1973, and the City never returned the money. In making his decision, the chancellor assumed that the City knew the facts.

■ ■   According to appellant, the second element of estoppel, that the party to be estopped must intend that the conduct be relied on, is satisfied by the City billing and collecting occupational taxes, thereby acquiescing in appellant's use of the house as an apartment building. The Arkansas Supreme Court has held that estoppel may only be applied against the State when there has been an "affirmative misrepresentation by an agent or agency of the State." *Arkansas Dep't of Human Servs. v. Estate of Lewis*, 325 Ark. 20, 922 S.W.2d 712 (1996). *See also Foote's Dixie Dandy, Inc. v. McHenry, supra.* Estoppel should not be applied where there was no clear proof of an affirmative misrepresentation. *Everett, Director v. Jones*, 277 Ark. 162, 639 S.W.2d 739 (1982). These requirements are equally applicable to municipal corporations. *Miller v. City of Lake City*, 302 Ark. 267, 789 S.W.2d 440 (1990). In the instant case there is no allegation of any affirmative misrepresentation by any agent of the City. The chancellor was correct in not applying estoppel to the City because of the City's acquiescence in appellant's use of the house as an apartment for many years.

■   As to the third element of estoppel, the party asserting the estoppel must be ignorant of the facts, appellant argues that he was justifiably ignorant of the zoning violation because the house was divided into apartments that were fully occupied when he purchased it, and, in the thirty years he has owned the house, the City never informed him that he was violating a zoning ordinance. Again, appellant is not claiming an affirmative misrepresentation by an agent of the City, only acquiescence. The chancellor found that since the zoning ordinance was law, and one is presumed to know the law, appellant could not rely on his igno-

rance. It has long been held that every person is presumed to know the law and that ignorance of its mandates is no excuse. *Henderson v. Gladish*, 198 Ark. 217, 128 S.W.2d 257 (1939). *See also Hogg v. Jerry*, 299 Ark. 283, 773 S.W.2d 84 (1989); *Dunkin v. Citizens Bank of Jonesboro*, 291 Ark. 588, 727 S.W.2d 138 (1987).

■ Finally, appellant contends the fourth element of estoppel, that the party asserting the estoppel must rely on the other's conduct and be injured by that reliance, is satisfied because he relied on the conduct of the City to his detriment by expending large sums of money paying the taxes and in purchasing and maintaining the house as an apartment building. The chancellor found that the fourth element was not satisfied in that the City had done nothing appellant was justified in relying on. This conclusion was not clearly erroneous.

■ Appellant's final point is that the doctrine of laches should bar the city from enforcing the zoning ordinance against him. To apply laches there must be an unreasonable delay by the plaintiff, and the suffering of a detrimental change in position by the defendant. The doctrine of laches is based on a number of equitable principles that are premised on some detrimental change in position made in reliance upon the action or inaction of the other party. *Self v. Self*, 319 Ark. 632, 893 S.W.2d 775 (1995); *Anadarko Petroleum v. Venable*, 312 Ark. 330, 850 S.W.2d 302 (1993). It is based on the assumption that the party to whom laches is imputed has knowledge of his rights and the opportunity to assert them, that by reason of his delay some adverse party has good reason to believe those rights are worthless or have been abandoned, and that because of a change of conditions during this delay it would be unjust to the latter to permit the former to assert his rights. *Self, supra; Briarwood Apartments v. Lieblong*, 12 Ark. App. 94, 671 S.W.2d 207 (1984).

Appellant contends that if the City had enforced the zoning ordinance against Minginas, appellant would not have bought the property as an investment in rental property, and he would not have spent so much money in maintaining and improving the property as a multi-family dwelling. In addition, he argues that because of the delay, many witnesses have died or memories have

faded and he was prejudiced by the lack of witnesses to prove his case.

We find appellant's arguments unpersuasive. The equitable doctrine of laches cannot be successfully invoked to defeat the right of a city to enforce its ordinances. *See Bushmiaer v. City of Little Rock*, 231 Ark. 848, 333 S.W.2d 236 (1960); *Thomas v. City of Little Rock,* 52 Ark. App. 24, 914 S.W.2d 328 (1996). *See also Township of Fairfield v. Likanchuk's, Inc.*, 274 N.J.Super. 320, 644 A.2d 120 (1994), in which the court held:

> A municipality's "prior tolerance of a use in violation of a zoning ordinance . . . will not estop the municipality from later enforcing the ordinance." Thus, a municipality's enforcement of its ordinance ordinarily "may not be prevented on grounds of estoppel merely because a suit to terminate the illegal use could have been commenced earlier." Further, the application of laches as a defense to a municipality's attempt to enforce its ordinance does not "comport with salutary public policy," and the doctrine should not be permitted to frustrate the enforcement of a valid zoning regulation "except in the clearest and most compelling circumstances." This is because the municipality represents "all the people of the municipality and the zoning ordinance is presumably for the benefit of the community as a whole."

644 A.2d at 127-28 (citations omitted).

Affirmed.

ROGERS and MEADS, JJ., agree.