AMERICAN TRANSPORTATION CORPORATION *v.*
EXCHANGE CAPITAL CORPORATION

CA 03-266                                               129 S.W.3d 312

Court of Appeals of Arkansas
Division III
Opinion delivered November 19, 2003

*Lax, Vaughn, Fortson, McKenzie & Rowe, P.A.*, by: *Roger D. Rowe*, for appellant.

*Skokos, Bequette & Billingsley, P.A.*, by: *Jay Bequette*, for appellee.

JOHN B. ROBBINS, Judge. Appellant American Transportation Corporation (AmTran) appeals from a judgment awarding appellee Exchange Capital (Exchange), as assignee of two trucking companies, $76,846.04 for unpaid invoices, some of which were fraudulently created by the trucking companies. We reverse and remand.

AmTran operated a manufacturing plant in Conway, Arkansas, and engaged AFS Logistics, Inc. (AFS), under a logistics management contract, to handle all transportation of parts and materials to and from its plant. From time to time, AFS chose Thunder Transport, Inc. (Thunder), or Lightning Transportation (Lightning), to provide these trucking services. Exchange had entered into factoring contracts whereby it advanced funds to

Thunder and Lightning in exchange for assignment of accounts receivable, plus a fee from the payments collected.[1] The accounts receivable were to be evidenced by original invoices and standard shipping documents, such as bills of lading. John Coffey testified that appellee advanced eighty-five percent of each invoice. Exchange's practice was to review and accept these invoices, advance funds to Thunder or Lightning, then forward the invoices to AFS, eventually receiving a check from AFS in payment of the accounts.

Unbeknownst to the parties before August 1999, Thunder and Lighting were using a scheme whereby the trucking companies would use altered or duplicate backup documents to obtain multiple payments for the same load of freight. Jill Fagan, former director of accounting and order services for AmTran, testified that, in August 1999, she noticed that AmTran's transportation costs were running higher than expected, which prompted an investigation. As part of the investigation, she and employees under her supervision reviewed all of Thunder and Lightning invoices and the attached bills of lading. Upon discovery of the fraud, AmTran and AFS ceased making payments to Exchange.

Exchange sued AmTran and AFS seeking $90,407.11 for Thunder's unpaid accounts receivable. AmTran answered, denying that it was indebted to appellee and affirmatively pleading that Thunder's fraud barred collection against these invoices. AmTran filed a counterclaim against Exchange for restitution of payments made against the fraudulent invoices. AmTran also asserted a cross-claim against AFS seeking indemnification for any judgment entered against AmTran. Exchange denied the allegations of the counterclaim. In addition, AmTran filed suit against Thunder and Lightning for fraud and against AFS for failure to detect or prevent the fraud. Prior to trial, AmTran and AFS settled their dispute.

At trial, Exchange introduced its list of unpaid invoices, totaling $90,407.11, as proof of its contract damages. John Coffey testified that Exchange always dealt with AFS, not AmTran, and that AFS always considered a receipt or signature as proof of delivery. He also testified that AFS would sometimes accept a duplicate bill of lading instead of an original. He also testified that Exchange's contract with its factoring clients required the client to

---

[1] There was testimony from John Coffey, chief executive officer of Exchange, that Exchange's relationship with Lightning ended in October 1998.

submit original invoices and documentation to Exchange and that Exchange's personnel used due diligence to determine whether the supporting documentation was proper. Coffey also said that Exchange did not advance funds on every invoice submitted by Thunder or Lightning and that Exchange looked to AFS's credit-worthiness in determining whether to advance funds to Thunder or Lightning. He testified that the total amount advanced was $74,679.15.

Jill Fagan explained that AFS received and reviewed these invoices before sending AmTran a weekly statement of the aggregate amount of the transportation charges of various companies. The statement consisted of a summary of the companies that had transported materials, a reference to the invoice number relating to the particular shipment, and the total amount due to each of the companies. The summary statement typically was accompanied by a stack of backup documentation consisting of invoices and supporting documents. Each week, AmTran made one payment to AFS based on the summary statement and AFS distributed payment to the transportation companies it had selected. Fagan testified as to several examples of invoices that she identified as having altered or duplicative supporting documents. She testified that she prepared a spreadsheet showing invoice numbers, dates of purported delivery, and the identification of the altered and original bills of lading attached to the invoices. In compiling the spreadsheet, she testified that she identified as fraudulent only those invoices with altered or duplicative bills of lading or backup documents attached. Fagan testified that the spreadsheet also identified each of the fraudulent invoices, which together totaled $272,494.56 and included some invoices for which Exchange had not been paid. Fagan also testified that she cross-referenced her spreadsheet with Exchange's list of open invoices and determined that $30,968.80 of the $90,407.11 in invoices sued upon were fraudulent. She calculated that AmTran had $145,717.95 worth of fraudulent invoices that it had either paid or were still open, which exceeds the amount sued upon. She stated that AmTran did not receive the goods that were listed on the fraudulent invoices and that there were possibly other duplicate invoices that AmTran did not discover. Fagan also testified that the duplicate invoices included those submitted by Lightning prior to termination of its relationship with Exchange.

The trial court found that it was obvious that Thunder and Lightning were using false and fraudulent invoices and bills of lading to obtain advances from appellee and that appellant, appellee, and AFS all were at fault to some degree. The trial court relied on the supreme court's decision in *Benton State Bank v. Warren,* 263 Ark. 1, 562 S.W.2d 74 (1978), and concluded that appellant and AFS were in the best position to detect the fraudulent scheme by Thunder and Lightning and awarded appellee judgment in the sum of $76,846.04 and attorney's fees of $7,500. The $76,846.04 represented 85% of the $90,407.11 in open-account invoices sued for by appellee. Judgment was entered, and AmTran appeals.

Appellant argues two points on appeal: (1) the trial court failed to properly apply Ark. Code Ann. § 4-9-318[2] and allowed appellee to recover in a situation where its assignor would not be able to recover; (2) the trial court erred in awarding appellee its attorney's fees. Appellant concedes that its argument on the second point is contingent upon its prevailing on its first point. Therefore, we address the two points as one.

■  The standard that we apply when reviewing a judgment entered by a circuit court after a bench trial is well established. We do not reverse unless we determine that the circuit court erred as a matter of law or we decide that its findings are clearly against the preponderance of the evidence. *Riffle v. United Gen. Title Ins. Co.,* 64 Ark. App. 185, 984 S.W.2d 47 (1998). However, a trial court's conclusion of law is not entitled to the same deference. *See Duchac v. City of Hot Springs,* 67 Ark. App. 98, 992 S.W.2d 174 (1999).

*Benton State Bank* was correctly considered by the trial court in resolving AmTran's counterclaim against Exchange (which is not appealed from) but is distinguishable from the present case (Exchange's action as assignee to recover under the contract). In *Benton State Bank,* the issue was which party, as between Warren (the owner/general contractor) and the bank, should bear the loss paid by Warren and caused by the subcontractor's failure to pay the

---

[2] The General Assembly adopted a new Article 9 to govern secured transactions in 2001, effective July 1, 2001. 2001 Ark. Acts 1439. The present case was commenced prior to July 1, 2001, and the prior version governs this case. *See* Act 1439, § 1(c). All references will be to the 1991 version of the statute unless otherwise noted. Former Ark. Code Ann. § 4-9-318 (1991) now corresponds, with modifications, to Ark. Code Ann. § 4-9-404 (2001).

suppliers. In the present case, the question is whether appellee, as assignee of Thunder, in bringing suit against appellant and AFS on the contract between Thunder and AFS, is subject to the defense of fraud to the same extent as Thunder would be had it brought suit.

In *Benton State Bank v. Warren, supra*, unpaid suppliers of building materials sued the subcontractor and the owners/general contractor for money due them. The owners had made progress payments, intended to pay for materials, jointly to the subcontractor and his assignee bank. The bank credited the money received against its outstanding loans to the subcontractor. The progress payments were made on the basis of false certifications by the subcontractor that all previous bills for labor and materials had been paid. The owners were ultimately required to pay for the labor and materials a second time when the subcontractor finally defaulted. The question presented to the court was whether the losses involved should be borne by the owners or by the bank or, in other words, whether the owners were entitled to recover their earlier payments to the bank. The supreme court found that the critical factor was the relative degree of fault of the parties. It held that, although the owners had been remiss in not verifying payment of the subcontractor's bills, the bank/assignee had ample reason to suspect that it was receiving payments that should have been used to pay for materials. The bank bore the greater fault and, consequently, the risk of loss. The bank was, therefore, required to reimburse the owners/general contractor for the amount paid to satisfy the subcontractor's suppliers.

■ Appellee's reliance on *Michelin Tires (Canada) Ltd. v. First National Bank*, 666 F.2d 673 (1st Cir. 1981), and *Irrigation Association v. First National Bank*, 773 S.W.2d 346 (Tex. App. 1989), is misplaced because those cases involved account debtors seeking affirmatively to recover the payments made to an assignee, which is more akin to appellant's counterclaim against appellee than appellee's claim against appellant and AFS. Appellant has specifically stated in its brief that it is not appealing the judgment against it on its counterclaim. *Michelin Tires* relied in part on Justice Byrd's dissenting opinion in *Benton State Bank* and held that the account debtor could not recover on an affirmative claim. In this regard, *Michelin Tires* is contrary to Arkansas law as expressed by *Benton State Bank*. Both *Michelin Tires* and *Benton State Bank* are restitution cases where the account debtor was seeking to recover payments made to the assignee, not cases where the assignee is

bringing suit on the contract as is the present case. *See* James J. White et al., *Uniform Commercial Code* § 34-6 at 370 (5th ed. 2001). As such, it was appropriate for the trial court to balance the equities in deciding whether to award restitution. *See Frigillana v. Frigillana*, 266 Ark. 296, 584 S.W.2d 30 (1979).

■ The trial court stopped its analysis with *Benton State Bank, Michelin Tires*, and *Irrigation Association*; this was error because a different body of law governed Exchange's claim as Thunder's assignee against AmTran and the trial court did not discuss this body of law.

■ An assignee ordinarily obtains only the rights possessed by the assignor at the time of the assignment, and no more. *First Nat'l Bank of Fayetteville v. Massachusetts Gen. Life Ins. Co.*, 296 Ark. 28, 752 S.W.2d 1 (1988); *Office of Child Support Enfcm't v. Watkins*, 83 Ark. App. 174, 119 S.W.3d 74 (2003). As stated by the *Restatement (Second) of Contracts*, § 336, Comment b (1981), an assignor can assign "only what he has," and the assignee's right "is subject to limitations imposed by the terms of that contract [creating the right] and to defenses which would have been available against the obligee had there been no assignment." These common-law principles were codified in the Uniform Commercial Code as section 4-9-318.[3] As such, Exchange stands in Thunder's position and is subject to any defenses AmTran could raise if Thunder had brought suit.

■■ In the present case, the contract sued upon was the contract between Thunder and AFS and was an exchange of mutual promises: Thunder, to haul freight for AmTran; AFS, as agent for AmTran, to pay for the freight services. *See Restatement (Second) of Contracts*, § 238 (1981). The evidence that Thunder submitted fraudulent invoices is undisputed. Jill Fagan testified that $30,968.80 of the $90,407.11 in invoices sued upon were fraudulent and that AmTran did not receive the goods that were listed on the fraudulent invoices. As a general rule, the failure of one party to perform his contractual obligations releases the other party from his obligations. *TXO Prod. Corp. v. Page Farms, Inc.*, 287 Ark. 304, 698 S.W.2d 791 (1985); *Stocker v. Hall*, 269 Ark. 468,

---

[3] Section 4-9-318(1)(a) (1991) reads in part, "the rights of an assignee are subject to ... [a]ll the terms of the contract between the account debtor and assignor and any defense or claim arising therefrom...."

602 S.W.2d 662 (1980); 9 Arthur L. Corbin, *Corbin on Contracts*, § 895, pp. 524-26 (Interim ed. 2002). Exchange argues that AmTran, through Fagan, admitted liability for some $59,000 in unpaid invoices. However, this misses the point that AmTran alleges that it overpaid Exchange for fraudulent invoices in an amount greater than that sued upon. This could be a complete setoff against Exchange's claim, if proven. *See Walker v. First Commercial Bank*, 317 Ark. 617, 880 S.W.2d 316 (1994). We reverse and remand for a new trial.

On AmTran's second point concerning the award of attorney's fees to Exchange, we also reverse because Exchange is no longer a "prevailing party" entitled to attorney's fees under Ark. Code Ann. § 16-22-308 (1999).

Reversed and remanded.[4]

PITTMAN and ROAF, JJ., agree.

---

[4] The parties presented voluminous addenda containing hundreds of pages, all of the invoices at issue in this case, plus numerous additional documents. We find that this was unnecessary in light of the way the case was argued on appeal and remind counsel that an abstract and addendum can be deficient for containing *too much* material, as well as too little. *See Miller v. Hometown Propane Gas, Inc.*, 82 Ark. App. 82, 110 S.W.3d 304 (2003); *Frigon v. Frigon*, 81 Ark. App. 314, 101 S.W.3d 879 (2003).